**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles TAYLOR, Defendant–Appellant.**

**No. 96–2745.**

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1997.

Decided Jan. 30, 1998.

Barry Rand Elden, Chief of Appeals, Juanita Temple (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Robert G. Clarke (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Charles Taylor's venture into bank robbery did not quite qualify him for a slot on the evening news shows that report crimes gone awry in some amusing fashion, but it is fair to say that his effort to rob the Elgin, Illinois branch of Bank One Chicago, N.A., was ill-fated  Charles and his brother, Creston Taylor, robbed the bank, but Charles was arrested shortly thereafter and was ultimately charged with armed robbery in violation of 18 U.S.C. § 2113. A jury convicted him, and Charles has appealed claiming that the district court erred in a number of respects in its application of the Sentencing Guidelines. Because we find that the court's interpretations of the Guidelines were correct and that its findings of fact were not clearly erroneous, we affirm the sentence.

On the evening of April 3, 1995, Charles and Creston Taylor cruised by the Bank One branch in Charles's green Chevrolet Monte Carlo to see if it would make a good robbery target. (To distinguish between the two brothers, we will refer to Creston Taylor as "Creston" and Charles Taylor as "Charles.") They decided it was and resolved to return the next day. In keeping with their plan, the next morning Creston entered the bank and began filling out a credit card application using the name and address "Melvin T. Genson, 1085 Bent Tree Court, Elgin, Illinois." Creston had a container of pepper spray in a canister that looked as if it contained mace; his role was to use the pepper spray as needed on people around the bank. After a few minutes, Charles arrived, walked over to teller Melissa Unruh, and said, "This is a stick up." He was carrying a large handgun (later shown to be a pellet gun), which he pointed at her while he ordered her not to push any buttons.

Handing Unruh a pillow case, Charles told her to begin putting money in it. As this was happening, Creston forced two other bank employees, Patricia Nelson and Melissa Rudin, to lie face down on the floor and he sprayed their faces with his pepper spray. Meanwhile, Charles became impatient with Unruh's progress filling the bag, and he leapt over the counter and started stuffing it himself. After the cash drawer was empty (and $18,595 had made its way into the bag), Charles ordered Unruh to open the safe inside the bank vault. She hesitated; Charles shoved the gun in her back and pushed her in that direction, and she then informed him that she could not open the vault without another person to help her, because the safe required the use of two separate keys. Charles then brought her to the lobby area towards Creston and the two employees on the floor. Creston sprayed her with pepper spray, at the same time as Charles grabbed Rudin to try to get her to help with the vault. Because Unruh had not left her key to the safe inside the vault, Rudin was also unable to open it. Frustrated, Charles told Creston to spray all three of them some more, which he did. The two brothers then slipped out through the back door, where Charles's wife Melody was waiting for them in the green Monte Carlo.

There matters might have stood for some time if Creston had been somewhat cagier in filling out the phony credit card application. Unfortunately for Charles, however, Creston had used an address much too close to home—literally. The application had said "1085 Bent Tree Court." Logically using that as an investigatory lead, it did not take the police long to reach 1062 Bent Tree Court, which happened to be Charles Taylor's residence. Officer Wood of the Elgin police searched the home with the consent of Melody, Charles's wife. He found an empty pepper spray canister in an upstairs closet.

On April 14, 1994, the Elgin police arrested Charles under an outstanding warrant. Once in custody, he voluntarily told the police about the bank robbery, but he did not identify Creston as his accomplice. Instead, he told them that the accomplice was a person called "G–Dog" whom he could not identify further. On June 29, 1995, Charles Taylor was indicted for armed bank robbery, a violation of 18 U.S.C. § 2113(a) and (d). After a jury trial, he was convicted as charged.

About a month later, Creston turned himself in to the FBI and admitted his participation in the robbery—although he claimed the robbery was his brother's idea. Creston was later charged and pleaded guilty under a plea agreement. Creston's confession became important at Charles's July 1996 sentencing hearing. Charles submitted a letter from Creston in which Creston asserted that he (Creston) had only said that the robbery was Charles's idea so that he would get a lighter sentence for himself. Nevertheless, Creston testified at Charles's sentencing hearing that the idea for the robbery originated with Charles.

At the conclusion of the hearing, the district court determined that Charles's final adjusted offense level was 33 and his criminal history category was V. In calculating the offense level, the court began with a base offense level of 20, under U.S.S.G. § 2B3.1. It then added two levels under § 2B3.1(b)(1)(A) because the property of a financial institution was taken, and another one-level enhancement under § 2B3.1(b)(6)(B), since recodified to § 2B3.1(b)(7)(B), because the value of the loss exceeded $10,000. The court also included four other enhancements to which Charles objected: (1) a two-level enhancement under § 2B3.1(b)(3)(A) for inflicting bodily harm on a victim of the robbery; (2) a four-level enhancement under § 2B3.1(b)(2)(D) for otherwise using a dangerous weapon during the robbery; (3) a two-level enhancement under § 3B1.1(c) for Charles's leadership role in the offense; and (4) a two-level enhancement under § 3C1.1 for obstructing justice. All of this resulted in a sentence of 222 months in prison, to be followed by three years of supervised release.

On appeal, Charles challenges the same four enhancements to his sentence: first, he claims that the enhancement under § 2B3.1(b)(3)(A) for inflicting injury was wrong under the facts of this case; second, he argues that the evidence does not support the court's finding that a dangerous weapon was "otherwise used," and thus that the enhancement under § 2B3.1(b)(2)(D) was erroneously imposed; third, he claims that the court gave no reasons for its finding that he was a leader, which resulted in the enhancement under § 3B1.1(c); and finally, he claims that the court never found that anything he did constituted a materially false statement to a law enforcement officer that would have justified the obstruction enhancement under § 3C1.1. His first two arguments are essentially evidentiary in nature; we therefore review the district court's action only for clear error. To the extent in the last two points he is arguing that the court failed to follow procedures mandated by law, we review the court's actions *de novo;* for the underlying facts, the clear error standard is again the appropriate one.

*1. Bodily Harm: § 2B3.1(b)(3)(A).* Charles offers three reasons why the court should not have imposed the two-level enhancement of § 2B3.1(b)(3)(A) for the infliction of bodily injury on the victim bank tellers: he notes that he did not mace the workers and should not be accountable for the macing done by his brother; he asserts that the "quality of proof" of bodily injury was insufficient; and (to more or less the same effect) he argues that the evidence at the hearing was insufficient to support the court's finding of the requisite injury.

The Sentencing Guidelines define "bodily injury" to mean "any significant injury; *e.g.,* an injury that is painful or obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, comment. (n.1(b)). In addition, the Guidelines specify when a defendant must be held accountable for the harm caused by the actions of his accomplice. In § 1B1.3(a)(1)(B), comment. (n.2), the Guidelines state that "a defendant is accountable for the conduct ... of others that was ... reasonably foreseeable in connection with [jointly undertaken] criminal activity." On this record, the district court reasonably found that Creston was Charles's accomplice in the robbery. The record also contained evidence indicating that Charles knew that Creston carried the can of pepper spray into the bank and was present when Creston used the spray. The court's decision to hold Charles responsible, under the rule of § 1B1.3(a)(1)(B), for Creston's conduct, was certainly not clearly erroneous—indeed, it is

hard to see what else the court could have concluded.

██ With respect to the question whether the victims suffered "bodily injury" during the offense, the government called Janet Bell, a supervisor at the bank, to testify about the tellers' injuries. Bell reported that immediately after the robbery she saw paramedics administering oxygen to the tellers in an ambulance, flushing out their eyes, and checking for damage. Bell later learned that the tellers had been taken to the hospital and treated for burning and irritated skin in the face and mouth area, and that one had been placed on heart monitoring equipment because of a preexisting heart condition. Last, Bell testified that each teller spent from two to five hours at the hospital and missed periods of work ranging from five days to two weeks as a result of the trauma of the incident. The district court credited her account of their injuries and concluded that these facts warranted the "bodily injury" enhancement, relying in part on our decision in *United States v. Robinson*, 20 F.3d 270 (7th Cir.1994).

██ In *Robinson*, as here, the defendants used pepper-type mace spray to subdue their victims temporarily during the course of a bank robbery. This court found that the enhancement was appropriate on those facts. Charles's only remaining challenge relies on the fact that Bell's testimony is largely a secondhand report of their injuries. He points to the *Fourth Circuit's decision in United States v. Lancaster*, 6 F.3d 208 (4th Cir.1993), which criticized imposition of the "bodily injury" enhancement where the principal evidence came from a bank executive who learned of the tellers' treatment through intermediaries. First, this case is different, because Bell personally observed the paramedics treating the victims. Second, this objection amounts to a criticism of the use of hearsay evidence. Where evidence is otherwise reliable, however, it is well established that hearsay is acceptable during the sentencing phase. *United States v. Edwards*, 115 F.3d 1322, 1326 (7th Cir. 1997); *United States v. Barnes*, 117 F.3d 328, 337 (7th Cir.1997). Bell's direct contact with the tellers, her first-hand observation of the effects of the pepper spray on them, and her responsibility to monitor their health after the event all satisfy us that the district court did not clearly err in deciding to rely on her testimony. We therefore reject Charles's challenge to this enhancement.

██ *2. "Otherwise Used" a Dangerous Weapon: § 2B3.1(b)(2)(D).* Under U.S.S.G. § 2B3.1(b)(2), a defendant receives a three-level enhancement if a dangerous weapon is merely "brandished or possessed," but a four-level enhancement if it is "otherwise used." Charles correctly points out that the term "otherwise used" means that "the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." See U.S.S.G. § 2B3.1, comment. (n.1); U.S.S.G. § 1B1.1, comment. (n.1(g)). In his view, poking a pellet gun into someone's back, which the evidence showed Charles did to teller Unruh, does not qualify as "otherwise using" a dangerous weapon under this definition. In other cases arising under this part of the Guidelines, such as *United States v. Seavoy*, 995 F.2d 1414, 1422 (7th Cir.1993); *United States v. Matthews*, 20 F.3d 538, 554 (2d Cir.1994); and *United States v. Johnson*, 931 F.2d 238, 240 (3d Cir.1991), this enhancement was applied when the use of the weapon was coupled with an explicit threat. Since (Charles asserts) there was no such threat proven here, he reasons that the four-level enhancement must be unavailable.

We cannot accept this reading of § 2B3.1(b)(2)(D). Nothing in the language of the Guideline calls for the use of the weapon to be coupled with a verbal threat, as the explanation in the Application Notes quoted above plainly shows. This does not mean that the enhancement is inappropriate in cases where a threat exists, of course; it only means that a threat is not a necessary part of the proof needed for this enhancement. Instead, we look first to see if the defendant used a dangerous weapon at all, and then we must decide whether the use was something between actual discharge of a firearm and mere brandishing or possessing. Here, it is undisputed that a pellet gun is treated under the Guidelines as a "dangerous weapon."

See U.S.S.G. § 1B1.1, comment. (n.1(e)). As for Charles's use of the gun, we conclude that poking it into Unruh's back was at least as serious as leveling a dangerous weapon at someone's head or pointing it at a specific person without any physical contact. We have already found that the latter behavior constitutes "otherwise using" the dangerous weapon within the meaning of § 2B3.1(b)(2)(D). See *United States v. Hernandez,* 106 F.3d 737, 741 (7th Cir.1997) (noting that such conduct intensifies the level of threat beyond what was necessary to instill fear in a reasonable person). The district court correctly interpreted the Guideline, and its factual findings supporting the enhancement were once again well supported by the record (and thus not clearly erroneous).

■ *3. Role in the Offense: § 3B1.1(c).* Charles argues here that the court's decision to impose the two-level increase under U.S.S.G. § 3B1.1(c) for being the "organizer, leader, manager, or supervisor in any criminal activity" that involved less than five participants was wrong because the court gave no reasons for its decision, in disregard of Fed.R.Crim.P. 32(c)(1). Once *again,* his argument cannot withstand scrutiny—in this case our de novo review of the district court's compliance with the requirement for stating its reasons.

The question of Charles's role in the offense was thoroughly explored in the presentence report and Charles's objections to that report. The report noted that Charles had gone to the bank days before the robbery to study it; that Creston had testified that the robbery was Charles's idea; and that Charles had kept all but about $400 of the proceeds. In his objections to the report, Charles argued principally that Creston's testimony on this point was too unreliable to provide a basis for the enhancement. Because Creston's credibility had been put in issue, the court directed the government to make him available for live testimony at the sentencing hearing. After hearing Creston and reviewing the report, the district court made the following comments (which also pertain to the obstruction enhancement we discuss last):

Well, I am going to overrule your objection and find that he does get an additional enhancement of two [for obstruction of justice] through his actions in submitting a letter which he knew to be false with the attempt, at least in part, to get the Court to not give the enhancement for role in the offense. I also am finding that he had a leadership role in the offense. So, he gets a two-level increase under 3B1.1(c).

The court also indicated in its statement of reasons for imposing the sentence that it "adopt[ed] the factual findings and guideline application in the presentence report." We have upheld similar statements of reasons in a number of other cases, *e.g., United States v. Pippen,* 115 F.3d 422, 424 (7th Cir.1997); *United States v. McKinney,* 98 F.3d 974, 981–82 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1119, 137 L.Ed.2d 319 (1997), which we find controlling here. The reference to the findings and rationale in the presentence report allows us, as a reviewing court, to evaluate the district court's decision, and that is all that is required. *United States v. Carson,* 9 F.3d 576, 584 (7th Cir. 1993); *Pippen,* 115 F.3d at 424.

■ *4. Obstruction of Justice: § 3C1.1.* Last, Charles argues that the enhancement for obstruction of justice should be reversed because, once again, the court did not make a precise enough finding to justify it. He claims that even if he made materially false statements to the investigators after his arrest, when he claimed not to know his accomplice by any name but "G–Dog," he declined to pick the accomplice's picture out of a photo spread, and he gave investigators a false lead about where "G–Dog" might be found, these actions did not "significantly obstruct or impede the official investigation." The government responds that these false statements and lack of cooperation added several months to the investigation while they searched for "G–Dog" through the summer and fall of 1995; their search only ended when Creston Taylor confessed in December 1995.

The obstruction enhancement is proper when a defendant makes "a materially false statement to a law enforcement officer that significantly obstructed or impeded the offi-

cial investigation or prosecution of the ... offense." U.S.S.G. § 3C1.1, comment. (n.3(g)). Whether the district court correctly imposed this adjustment is a question we review under the clearly erroneous standard. See *United States v. Teta*, 918 F.2d 1329, 1332 (7th Cir.1990). Contrary to Charles's argument, his statements to the government investigators went well beyond a simple refusal to identify his brother as his accomplice. They suggested a specific person whose identity Charles did not know—a crack user who might be found in the local neighborhood under the *nom de guerre* "G-Dog" In addition, as the district court noted when addressing Charles's role in the offense, Charles solicited a letter from Creston that was designed falsely to minimize the role that Charles had played. On this record, we see no error (clear or otherwise) in the district court's decision to impose the two-level enhancement provided by U.S.S.G. § 3C1.1.

For the foregoing reasons, we AFFIRM the judgment of the district court in its entirety.