In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3813

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

IAAD HAMAD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cr-01038-1 — **Amy J. St. Eve**, *Judge.*

ARGUED SEPTEMBER 30, 2015 — DECIDED JANUARY 4, 2016

Before BAUER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Cook County Department of
Revenue agents entered Iaad Hamad's convenience store
pursuant to an ordinance that allowed them to inspect cigarette
inventory. The agents found cigarettes without the appropriate
tax stamps, and also discovered a handgun and narcotics.
Hamad was convicted of one count of possession of a firearm
by a felon, in violation of 18 U.S.C. § 922(g)(1). He appeals the
district court's denial of his motion to suppress the firearm and

the incriminating statement he gave regarding the firearm. We affirm.

## I.

Iaad Hamad owned H & Y Chicago Foods, a small convenience store on the west side of Chicago. Among other items, the store sold cigarettes. Cook County (which encompasses Chicago) has an ordinance which taxes and regulates the sale of cigarettes. *See* Cook County Code of Ordinances, Title IX, Section 74–430, *et seq.* (2009) (hereafter "Cigarette Ordinance" or "Ordinance").[1] It is unlawful in Cook County, for example, to sell individual, unpackaged cigarettes or to sell packs of cigarettes that do not contain the proper tax stamps. The Cook County Department of Revenue employs inspectors to enforce the Ordinance. As we will discuss below, the Ordinance allows representatives of the Department of Revenue to inspect a retailer's books and records related to the sale of cigarettes and to examine the cigarette inventory itself.

The Department of Revenue had a list of prior violators of the Ordinance, businesses that had sold cigarettes without the proper tax stamps. Hamad's store was on the list. On October 15, 2010, two inspectors and an intern with the Department of Revenue approached H & Y Chicago Foods for an inspection. The intern, Courtney Marshall, entered the store first, and made an undercover purchase of a pack of Newport cigarettes for $6. At the time, the typical price of a properly-taxed pack of

---

[1]  The version of the Ordinance in effect at the time of the search may be found at pages 44-57 of: http://www.cookctyclerk.com/countyboard/ DocumentLibrary/2009ordinances.pdf (last visited January 4, 2016).

cigarettes in Chicago was $8 or $9. Marshall brought the suspiciously low-priced pack out to the inspectors, Jessa Srain and Aaron Glasper, who examined it and determined that it did not bear the required Cook County tax stamp. The inspectors and the intern then entered the store and identified themselves as Department of Revenue agents to two employees behind the counter.

Srain and Marshall then entered the area behind the counter to examine the cigarette inventory to determine if there were additional unstamped packs. Glasper went to the back of the store. Srain found another pack of unstamped cigarettes next to the cash register, and continued her search. On the floor behind the counter, she found a plastic grocery bag that contained two prescription bottles, loose pills, and a large, clear candy jar full of white pills.[2] As Srain continued her search, she recovered several additional prescription pill bottles, which she added to the bag. When she looked at the pills in the large jar, she could not identify all of them but believed that some were Vicodin, a narcotic pain killer. She contacted her supervisor and asked for guidance. The supervisor advised her to do what she thought best. She continued to search the area behind the counter.

In the meantime, Marshall, who was also searching behind the counter, felt a loose floorboard beneath his foot. He lifted the board and found a shoe box. Inside the shoe box, he found

---

[2]  The store had no pharmacy. The pills in the candy jar were eventually identified as 1500 hydrocodone pills. Hydrocodone is the active, narcotic ingredient in Vicodin.

magazines for a gun.[3] Srain then searched a shelf behind the door leading to the counter area. Under a pile of t-shirts, she found a velvet bag. When she picked up the bag, she felt an object that she realized was the handle of a gun. She again called her supervisor for guidance and this time, the supervisor directed her to call the police.

Officer Alejandro Gallegos responded to the call. When he arrived at the store, Srain pointed out the firearm and the large jar of pills. Someone else pointed out the prescription bottles. Officer Gallegos entered the area behind the counter and took custody of the gun, the gun magazines and the pills. The older of the two women working in the store identified herself to the officer as Alma Price, the store manager. She told Officer Gallegos that the other woman was her daughter. She also told the officer that Hamad owned the store and that she had already called him and left him a message. Officer Gallegos then arrested Alma Price for possession of the pills and gun. Price told the officer that she thought the jar contained candy and that Hamad had directed her to sell the "candy" for $5 per pill. She also told the officer that Hamad owned the gun.

A short time later, when Officer Gallegos was processing the arrest of Alma Price at the police station, he was notified that there was a man at the front desk asking for him. He went out to meet the man, who identified himself as Hamad. Officer

---

[3] In this context, a magazine is "a metal receptacle for a number of cartridges, inserted into certain types of automatic weapons and when empty removed and replaced by a full receptacle in order to continue firing." Webster's Unabridged Dictionary of the English Language, RHR Press, 2001. It is not a periodical publication.

Gallegos asked Hamad if he was the owner of the store and Hamad said he was. Hamad provided his identification to Officer Gallegos, and the officer then took Hamad into custody for the narcotics and gun recovered from the store. After Officer Gallegos read Hamad his rights, Hamad made a number of incriminating statements. Hamad was later charged under the federal statute prohibiting felons from possessing firearms. 18 U.S.C. § 922(g)(1).

Prior to trial, his attorney filed a "Motion to Quash Arrest and Suppress Evidence." R. 62. Because the government raises claims of waiver and forfeiture in the appeal, we will discuss the motion and the briefing in some detail. In the motion, Hamad identified Jessa Srain as a "police officer" from the Cook County Department of Revenue who conducted an inspection and search of the store. Hamad noted that there was no search warrant authorizing the search of the store, that as the owner and manager of the store he possessed a reasonable expectation of privacy in the premises, and that warrantless searches and seizures of property are presumptively unreasonable, subject to a few exceptions. He similarly objected to his warrantless arrest, contending that the presence of a gun was insufficient to support the arrest because the Taurus .38 caliber revolver was not, in and of itself, contraband. At the time of the arrest, Hamad argued, the officer had only the self-serving statement of Alma Price that the gun belonged to Hamad. The officer did not know at the time that Hamad lacked a valid Firearm Owner Identification Card or that he was a felon. Hamad did not further develop these arguments.

The government characterized Hamad's argument on the search of the premises and the seizure of the gun as vague and

confusing. The government focused instead on whether there
was probable cause for Officer Gallegos to seize the gun and to
arrest Hamad. The government noted that law enforcement
may seize items without a warrant if they have probable cause
to believe that the items are linked to criminal activity. In this
case, the gun was found in close proximity to a large jar of
narcotic pills, and the clerk told the officer that Hamad
directed her to sell the pills for $5 each. In the same general
area were two loaded gun magazines for a different type of
gun. The officer thus knew that someone at the store was
engaged in the unlawful possession and distribution of
controlled substances and reasonably inferred that the gun
hidden nearby was linked to the narcotics. The government
similarly argued that the officer had probable cause to arrest
Hamad as the owner of the store and as the person identified
by Alma Price as owning the gun and directing the sale of the
drugs. The government did not separately address the search
of the premises by Department of Revenue agents, and did not
cite to the Ordinance to justify the search. But attached to the
government's response were interview reports detailing the
investigation and describing the search as a "routine inspection
conducted by the Cook County Revenue agents" for the
purpose of identifying businesses selling cigarettes without tax
stamps. R. 65, at 9. Also included were Department of Home-
land Security interview reports for Srain and Gallegos, and the
arrest report for Alma Price. R. 65, at 8–19.

In reply, Hamad contended more clearly that the search by
Srain violated the Fourth Amendment because there was no
warrant and no consent to search. He again argued that
seizures of personal property are generally unreasonable in the

absence of a warrant, and that administrative searches of commercial property to enforce fire, health or housing regulations also require warrants. After summarizing the report of the interview of Srain, Hamad concluded, "For the county or city law enforcement agencies to suggest that the purchase of a package of cigarettes without a Cook County tax stamp affixed is their authority to search a place of business is blatantly sophomoric – and rather bizarre." R. 66, at 3.

After reviewing Hamad's reply, the district court issued an order directing the government to file a sur-reply addressing "yet another argument" raised in Hamad's reply, namely that "Defendant now claims for the first time that Cook County Department of Revenue Field Inspectors did not have authority to search HY [sic] Chicago Foods on October 15, 2010." R. 67. In reply, the government, for the first time justified the search as authorized by the Cook County Cigarette Ordinance as a warrantless administrative inspection of commercial property. Acknowledging that searches of commercial property generally require warrants, the government relied on *New York v. Burger*, 482 U.S. 691 (1987), for its claim that the Cigarette Ordinance nevertheless authorized this warrantless administrative search of commercial property. In the alternative, the government also asserted that the firearms and other items need not be suppressed because the items inevitably would have been discovered by lawful means. That is, the undercover purchase of a pack of cigarettes lacking the required tax stamps provided probable cause to obtain a warrant to search for other unlawful cigarettes. And the execution of that warrant would have led to the discovery of the gun, the pills and the gun magazines.

The district court denied the motion to quash the arrest and suppress the evidence. The court concluded that the warrantless search of the area behind the counter was a reasonable administrative search conducted pursuant to a regulatory scheme or statute under *Burger*. In *Burger*, the Court noted that the expectation of privacy in commercial premises is different from and less than a similar expectation in a person's home. Moreover, that expectation of privacy is even more attenuated in commercial property employed in closely regulated industries. The district court noted that a warrantless search pursuant to a regulatory scheme is reasonable if (1) there is a substantial government interest that informs the regulatory scheme; (2) the warrantless inspection is necessary to further the scheme; and (3) the statute's inspection program provides a constitutionally adequate substitute for a warrant. Applying these factors to the Cigarette Ordinance, the court concluded that each factor was met for the closely regulated tobacco business. And once the inspectors found the gun and pills, the court determined that Officer Gallegos had probable cause to seize them because the pills were a controlled substance being unlawfully distributed from the store, and the gun was found in close proximity to the pills. The court further found that Officer Gallegos had probable cause to arrest Hamad based on (1) the items found in his store; (2) the statements of Alma Price that Hamad told her to sell the pills for $5 each and that Hamad owned the gun; and (3) Hamad's own statements to the officer that he owned the store and the gun. The court therefore denied the motion. Following a jury trial, Hamad was convicted of being a felon in possession of a firearm, and was sentenced to twenty-seven months' imprisonment. He appeals.

## II.

On appeal, Hamad contends that the district court erred when it applied the *Burger* standards to a convenience store, which is not a closely regulated industry. He also contends that the Cigarette Ordinance violates the Fourth Amendment because it allows for administrative searches of businesses without defining the scope of the inspection and without limiting the discretion of the inspectors conducting the search. The government counters that Hamad forfeited these arguments by failing to raise them below. We agree that, in the district court, Hamad argued only that the search violated the Fourth Amendment because it was conducted without a warrant, and that the sale of an unstamped pack of cigarettes was insufficient justification for the warrantless search.

As our discussion of the motion to suppress reveals, Hamad did not argue in the district court that convenience stores are not closely regulated industries or that the Cigarette Ordinance is itself constitutionally deficient either on its face or as applied to him. Hamad therefore forfeited these issues and we review the district court's denial of his motion to suppress for plain error. *United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Raney*, 797 F.3d 454, 462 (7th Cir. 2015); Fed. Rule Crim. P. 52(b). In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights. *Olano*, 507 U.S. at 732; *Raney*, 797 F.3d at 462. An error is plain if it is clear or obvious. *Olano*, 507 U.S. at 734; *Raney*, 797 F.3d at 462. An error affects the defendant's substantial rights when it is prejudicial, that is, when it has

affected the outcome of the district court proceedings. *Olano*, 507 U.S. at 734.

"[W]arrantless searches are generally unreasonable, and … this rule applies to commercial premises as well as homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978). *See also Burger*, 482 U.S. at 699. Business owners possess reasonable expectations of privacy in commercial property with respect to both traditional police searches as well as administrative inspections designed to enforce regulatory statutes. *Burger*, 482 U.S. at 699–700. However, the Supreme Court has recognized exceptions to the warrant requirement for pervasively regulated businesses such as those dealing in firearms, *United States v. Biswell*, 406 U.S. 311, 316 (1972), and for closely regulated industries long subject to close supervision and inspection, such as the liquor industry, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74 (1970). The Court reasoned that certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of a such a business. *Barlow's*, 436 U.S. at 313. *See also Burger*, 482 U.S. at 700 (an expectation of privacy in commercial premises is different from, and less than, a similar expectation in an individual's home and is particularly attenuated in commercial properties employed in closely regulated industries). The business owner in a highly regulated or licensed industry in effect consents to the restrictions put in place by the government. *Barlow's*, 436 U.S. at 313.

In *Burger*, the Court set forth the standards for warrantless, administrative inspections of commercial premises in closely regulated industries. First, there must be a substantial govern-

ment interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless scheme must be necessary to further the regulatory scheme. And third, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 702–03. In order to meet the third factor, the regulatory statute must (1) advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and (2) it must limit the discretion of the inspecting officers. *Burger*, 482 U.S. at 703.

Hamad argues first that convenience stores are not closely regulated and have not been long subject to close supervision and inspection, and therefore warrantless inspections of convenience stores cannot be justified under the administrative search exception. But Hamad may not simply characterize his business as a convenience store to avoid the applicability of the administrative search exception and the Cigarette Ordinance. The defendant in *Biswell* owned a pawn shop but the Court found that his business was subject to warrantless searches under the Gun Control Act of 1968 because the pawn shop owner was a federally licensed firearms dealer. *Biswell*, 406 U.S. at 311–12. Similarly, Colonnade was a catering company that served alcohol and therefore was subject to warrantless inspections by the Treasury Department pursuant to a federal statute regulating sales of alcohol. *Colonnade Catering*, 397 U.S. at 72–73. Neither pawn shops nor catering companies are closely regulated as such, but sellers of alcohol and firearms are highly regulated and licensed and therefore subject to the administrative search exception.

Similarly, it is not because Hamad owns a convenience store that he is subject to the Cigarette Ordinance but because his business sells cigarettes. He makes no argument that the cigarette or tobacco industry is not closely regulated, except to complain in conclusory fashion that the search here was made in enforcement of tax collection, not cigarette regulation. In fact, there is a long history of regulation and licensing of cigarette sales in Chicago. A Chicago ordinance prohibited the sale of cigarettes by any person without a license as early as 1900, a mere twenty years after cigarettes began to be produced commercially in the United States.[4] *See Gundling v. City of Chicago*, 177 U.S. 183 (1900) (upholding the constitutionality of the Chicago ordinance requiring a license for cigarette sellers). The State of Illinois has also long regulated cigarette sales, enacting a Cigarette Tax Act in 1941 that permitted warrantless searches of cigarettes in a place of business and allowed inspectors to seize packages of contraband cigarettes. *See* 35 ILCS 130/18. Given that cigarettes have been regulated in Chicago for at least 115 years, indeed for most of their existence as a mass produced product, the district court did not commit plain error in treating retail cigarette sales as closely regulated.

Hamad next contends that the Cigarette Ordinance does not meet the third factor of the *Burger* test, namely that a statute's inspection program must provide a constitutionally

---

[4] Cigarettes were not widely consumed in the United States until the first cigarette rolling machine was patented in 1880, allowing for mass production. *See* http://www.britannica.com/topic/cigarette, last visited January 4, 2016.

adequate substitute for a warrant.[5] *Burger*, 482 U.S. at 703. As we noted above, in order to meet the third factor, the regulatory statute must (1) advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and (2) it must limit the discretion of the inspecting officers. *Burger*, 482 U.S. at 703. Hamad argues that the Ordinance fails to limit both the scope of the inspection and the discretion of the inspectors. In particular, he asserts that the Ordinance does not limit the time of the inspection to regular business hours, does not cabin the place of inspection, and makes the scope of the search limitless.

The relevant part of the Ordinance in place at the time of the inspection stated:

> Inspections. Books and records kept in compliance with Sec. 439 of this Ordinance shall be made available to the Department upon request for inspection and/or copying during regular business hours. Representatives of the Department shall be permitted to inspect or audit cigarette inventory in or upon any premises. An audit or inspection may include the physical examination of the cigarettes, packaging or the cigarette tax stamps. It shall be unlawful for any person to prevent or hinder a duly authorized Department repre-

---

[5] Hamad did not challenge the district court's conclusions on the first two factors of the *Burger* test as applied to the Cigarette Ordinance, and so we will not address them.

> sentative from performing the enforcement
> duties provided in this article.

Cook County Code of Ordinances, Title IX, Section 74–440 (2009). Section 74–431 provided that "[p]remises means, but is not limited to, buildings, vehicles or any place where cigarette inventory is possessed, stored or sold."

The court did not plainly err in concluding that the Ordinance adequately advised owners of commercial premises selling cigarettes that the search is being made pursuant to the law. The plain language of the Ordinance informs cigarette sellers that they must allow inspections of their books and inventory related to cigarette sales. *See Burger*, 482 U.S. at 711 (concluding that a statute allowing inspections of vehicle dismantling businesses on a regular basis is an adequate substitute for a warrant because it alerts business owners that inspections are not discretionary acts by a government official but are conducted pursuant to statute). As for the scope of the inspection, the Ordinance limits the time of inspection for books and records to regular business hours but arguably imposes no similar limit on the time to inspect and audit cigarette inventory. This omission is not fatal, however, because the court reasonably read the "regular business hours" limit to cover both the inspection of books and the auditing of inventory. More importantly, the search here did occur during regular business hours: Marshall purchased a pack of unstamped cigarettes immediately before the inspection took place. *See Burger*, 482 U.S. at 711. In *Burger*, the Court found that a statute allowing inspection of vehicle dismantling businesses was adequately limited in time where it allowed inspections during regular and usual business hours. 482 U.S.

at 711–12. The Cook County Ordinance is therefore adequately limited in time.

Hamad also argues that the use of the words "may include" in the language defining the scope of the search improperly allows inspectors to look anywhere because the language is permissive. But read in context, the Ordinance very clearly limits the scope of the inspection. The *Burger* Court found an inspection statute adequately limited in scope where it allowed inspectors to examine records as well as "any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises." 482 U.S. at 711–12. The Cigarette Ordinance similarly limits the inspections to the cigarettes themselves, their packaging and the tax stamps, and defines the premises as buildings, vehicles and "any place where cigarette inventory is possessed, stored or sold." Contrary to Hamad's claims, the Ordinance is limited to places where the shop keeper actually stores the inventory. The Department of Revenue representatives in this case went behind the counter where the store kept its cigarette inventory in order to conduct the inspection. The Ordinance clearly allowed the inspectors to be in that area of the store and to search for cigarettes that violated the Ordinance, including single, unpackaged cigarettes and unstamped packs of cigarettes. The areas they searched were places where cigarettes could be found and in fact were found. Hamad did not argue that the inspectors exceeded the scope of their authority when they pulled up the floor board, looked into the large jar of pills or picked up the velvet bag hidden beneath a pile of t-shirts. We therefore have no occasion to decide whether those actions exceeded the scope of the inspectors' authority under the

Ordinance or contravened the Fourth Amendment. On appeal, Hamad challenged only whether the Ordinance itself met the requirements of the Fourth Amendment, not whether the inspectors followed the Ordinance punctiliously. The district court did not plainly err in concluding that the Ordinance met the requirements set forth in *Burger*.

Hamad's contention that the court should have also suppressed the incriminating statements he later made to the police was entirely dependent on his claim that the Ordinance was not an adequate substitute for a search warrant. Because we have determined that the district court did not plainly err in finding the Ordinance adequate, we must also conclude that the court did not err in allowing Hamad's incriminating statements into evidence. We need not decide whether, in the alternative, the evidence could have been admitted under the inevitable discovery doctrine.

AFFIRMED