In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3203

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES M. KRUGER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cr-00113-wmc-1— **William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 16, 2016 — DECIDED OCTOBER 5, 2016

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Defendant-appellant James M. Kruger was arrested in 2013 after a day-long crime spree in southwestern Wisconsin during which he robbed his uncle, kidnapped a 69 year-old farmer, stole multiple vehicles, and drove over rural roads at speeds exceeding 100 miles per hour in an ultimately unsuccessful effort to elude capture by the authorities. He pleaded guilty to being a felon in possession of

firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1), and the district court ordered him to serve a prison term of 180 months. Kruger appeals the sentence, contending that the district court committed plain error in applying the Sentencing Guidelines when it found that he "otherwise used" a firearm to commit a kidnapping, *see* U.S.S.G. §§ 1B1.1, comment. (n.1(I)) & 2A4.1(b)(3), comment. (n.2), and assigned several points to his criminal history. We find no plain error in the enhancement for use of a firearm, and because any potential error in the calculation of his criminal history did not affect his advisory Guidelines sentencing range, we do not reach that issue.

## I.

Kruger has led a troubled life. He was born into a broken, dysfunctional family and placed in foster care at the age of 12. He began drinking at age 8 and smoking marijuana and crack cocaine at age 15. Psychiatric problems emerged during his adolescence. He was homeless from the ages of 18 to 25. He has a lengthy criminal history dating back to age 17 that includes multiple prior felony convictions. As a result of those convictions, during the time period relevant to this case, Kruger could not legally possess a firearm or ammunition in interstate commerce. § 922(g)(1).

On June 6, 2013, Kruger arranged to purchase a .22 caliber rifle and a 1,600-round canister of .22 caliber ammunition at a Gander Mountain store in Deforest, Wisconsin. Bonnie Forseth purchased these items at Kruger's behest; he told her that he was going to give the rifle to his father as a gift. Following the purchase, she placed the rifle in his truck and did not see it

again. Kruger's father would later tell investigators that Kruger did, in fact, give the gun to him. But at one or more points during the period of August 14 to August 28, 2013, both the rifle and the ammunition were in Kruger's possession.

On August 28, individuals who shared a residence with Kruger in Madison, Wisconsin spoke to a police detective and advised him that Kruger was selling cocaine from the residence and had threatened one of them with a rifle on the prior evening. Kruger reportedly was using both cocaine and methamphetamine to deal with his mental difficulties, and his behavior had become increasingly violent. His roommates indicated that they had first seen the rifle about two weeks earlier. They showed the detective an empty box for the rifle, which contained the June purchase receipt from Gander Mountain. They also advised the detective that the rifle itself was located behind the seat in Kruger's truck (one of them had placed it there at Kruger's instruction). The truck was located and impounded later that same day. Two days later, the truck was searched pursuant to a warrant. Inside was documentation confirming that Kruger was the registered owner of the truck. Also found was the rifle along with the 1,600 rounds of ammunition and another receipt from Gander Mountain. Kruger was arrested on an unrelated charge on September 3, but he was evidently released on a signature bond by mistake.

At approximately 6:30 on the morning on September 10, 2013, Kruger arrived at the home of his uncle, Keith "Dale" Kruger ("Dale"). Kruger was agitated and behaving irratio-

nally.[1] He pointed a gun to Dale's head and threatened to kill Dale and other family members. When Dale pushed the gun away, the two struggled and Kruger grabbed his uncle's neck and began to choke him, repeating the threat to kill him. Telling Dale that he needed money, Kruger demanded that he open a safe in the basement. Eventually, Dale was able to open the safe and Kruger took a small amount of money from within. Kruger also broke into a gun cabinet and took a rifle, semi-automatic handgun, and a shotgun. Dale eventually escaped to a neighbor's house and called the police. Kruger, in the meantime, fled the scene in his car.

Kruger drove to a farm in rural Cassville, Wisconsin, owned by Walter and Linda Reidl. Linda saw the car arrive on the property and pull into or behind a shed. As she approached the shed, Kruger pointed a handgun at her. She told him to put the gun down. Walter arrived on the scene at that moment from elsewhere on the property driving a truck and cattle trailer and Linda flagged him down. When Walter exited the truck, Kruger pointed the gun at his own head. The Reidls engaged Kruger in conversation about religion, during which Kruger advised them that he was a disciple of God. Yet, Kruger threatened to kill both the Reidls and himself. Walter had been planning to take a cow he had loaded onto the trailer to Bloomington, Wisconsin, for slaughter. Hoping to protect Linda, he suggested that he leave the farm with Kruger in the truck and drop him in Bloomington; Linda would remain

---

[1]   Hours earlier, Kruger had been spotted driving in the wrong direction on a one-way street in Platteville, Wisconsin. A police officer made an effort to pull him over, but Kruger sped away without stopping.

behind. Kruger agreed. He changed his clothes and took a cap and a pair of sunglasses from Walter, and Linda retrieved two cans of soda from the house for him. Kruger then ordered Walter into the passenger seat of the Reidls' truck, placed a shotgun in the cab, took a seat behind the wheel, placed the handgun he had previously pointed at Linda in his lap, and departed the farm with the cow in tow. Kruger told Walter that he also had explosives with him.

Kruger took Walter on a meandering two-hour journey to Dodgeville, Wisconsin, never stopping in Bloomington. Twice during the journey, Kruger put a crushed pill into one of the soda cans, lit the pill, and inhaled the smoke, telling Walter that it calmed him. At one point, Walter asked Kruger to let him go, but Kruger refused. Eventually, when the two reached Dodgeville, Walter persuaded Kruger to let him telephone his wife and tell her he was alright. Kruger gave Walter some money and directed him to see if he could buy some more soda from a taxidermy shop. Walter walked into Rickey's Ridge Taxidermy Studio, locked the front door behind him, told the proprietor that he was being held hostage, and asked him to call the police.

When Kruger heard sirens approaching, he sped away from the scene in the truck. (The trailer and cow had been ditched earlier.) Multiple squad cars gave chase, but Kruger initially managed to shake their pursuit. By this time, an advisory bulletin had been issued, local schools had been locked down, and area residents had been warned to stay in their homes; sheriff's deputies from four different counties and a state patrol aircraft were involved in the effort to capture Kruger. Kruger stopped at two other residences where he, among other things,

confronted another resident with a gun, trimmed off his goatee, and stole another vehicle. He was ultimately captured following another high-speed pursuit when police placed "spike strips" in his path and the tires of the stolen car were punctured, causing it to overturn. He was arrested and charged with multiple state offenses, but his use of firearms promptly brought him to the attention of the federal authorities as well.

In a superseding indictment, a federal grand jury charged Kruger with three counts of being a felon-in-possession in violation 922(g)(1). Count One was premised on Kruger's possession of the .22-caliber shotgun and the ammunition that Bonnie Forseth had purchased for him from Gander Mountain at his behest on June 6, 2013. Count Two charged that Kruger had possessed the same shotgun and ammunition between August 14 and August 28, 2013. Count Three arose from the lengthy crime spree of September 10, 2013, and charged him with the possession of three separate firearms during the course of that day.

Kruger pleaded guilty to Counts Two and Three pursuant to a written plea agreement. At the change of plea hearing, Kruger professed some uncertainty as to when exactly, during the two-week period in August 2013 referenced in Count Two of the indictment, he had possessed the .22-caliber rifle and ammunition he had purportedly purchased for his father. The government's proffer focused on the end of that period, when police learned from Kruger's housemates that he was in possession of the rifle and impounded the truck in which he had stored it. When the court questioned Kruger about Count Two, he admitted that he was in constructive possession of the

.22-caliber ammunition, "probably multiple times" between August 14 and August 28 but could not recall precisely when. R. 146 at 22. He also acknowledged that, at different times during that same period, he had also possessed (or constructively possessed) the rifle; but, again, he could not specify when. R. 146 at 21, 22-23.

At sentencing, Kruger's offense level, criminal history, and advisory sentencing range were calculated using the November 2014 Sentencing Guidelines. Counts II and III were grouped together for that purpose. Because Kruger had possessed one or more of the firearms in connection with other felony offenses (including the robbery of his uncle and the kidnapping of Walter Reidl), his offense level was ultimately calculated using the kidnapping guideline, which produced the highest offense level. *See* U.S.S.G. §§ 2K2.1(c)(1); 2X1.1; 2A4.1. Among other enhancements, the district court imposed a two-level enhancement for use of a dangerous weapon in conjunction with the kidnapping. § 2A4.1(b)(3). The district court specifically found that "the defendant used a dangerous weapon, here a nine millimeter handgun[,] to force [Walter Reidl] to remain in the truck while the defendant drove." R. 140 at 6; *see also* R. 138 at 4. Kruger was assigned a total of six criminal history points, which placed him into a criminal history category of III. Two points were imposed pursuant to section 4A1.1(d) on the basis that Kruger was still serving probation on a state disorderly conduct charge when he engaged in the offense conduct underlying the indictment in this case. R. 127 ¶ 87; R. 138 at 4; R. 140 at 4-5. Kruger was also assessed one criminal history point for the state offense of operating a motor vehicle under the influence of a controlled

substance on September 10, 2013. R. 127 ¶ 84. With an adjusted offense level of 38, the Category III criminal history produced a sentencing range of 292 to 365 months. However, because the statutory maximum term was twenty years (ten years for each of the two counts to which Kruger had pleaded guilty), a term of 240 months became the Guidelines range. *See* U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

After hearing from counsel for both parties and from Kruger himself, the district court ordered Kruger to serve a below-Guidelines sentence of 180 months. Among other mitigating factors, the court took note of Kruger's difficult childhood, his polysubstance drug abuse, and his history of mental health problems. On the other hand, the court observed that Kruger's psychiatric problems were not as bad as he made them out to be, that Kruger did not comply with his prescribed regime of medication, and instead resorted to narcotics in an ill-advised effort to self-medicate. The court also noted that Kruger's offenses were serious, that his criminal behavior reflected a pattern of escalation, and that he was a dangerous individual from whom the public needed to be protected. That said, the court was not convinced that a sentence as long as that called for by the Guidelines was necessary to achieve specific deterrence.

## II.

Kruger's appeal challenges the calculation of his advisory sentencing range under the Guidelines. It is the court's first task at sentencing to properly calculate that range. *E.g., Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines no longer bind the court after *United States v.*

*Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), the court nonetheless "must consult those Guidelines and take them into account when sentencing." *Molina-Martinez*, 136 S. Ct. at 1342 (quoting *Booker*, 543 U.S. at 264, 125 S. Ct. at 767). The failure to properly apply the Guidelines and to correctly calculate a defendant's sentencing range thus amounts to a "significant procedural error," *id.* at 1346 (quoting *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007)), because the Guidelines continue to serve as "'the framework for sentencing' and 'anchor … the district court's discretion,'" *id.* at 1345 (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2083, 2087 (2013)).

Kruger's first contention focuses on the two-point increase in his offense level pursuant to Guidelines section 2A4.1(b)(3). Kruger contends that it was error for the court to find that he "otherwise used" a dangerous weapon in the course of kidnapping Walter Reidl, *see* U.S.S.G. § 1B1.1, comment. (n.1(I)); in Kruger's view, he at most brandished a firearm. Second, Kruger contends that three criminal history points were assigned to him in error and that his criminal history category should have been II rather than III. These issues were not raised below, and consequently our review is limited to a search for plain error. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776 (1993). We conclude that the district court did not plainly err in finding that Kruger "otherwise used" a firearm for purposes of the kidnapping guideline. And because any error with respect to the calculation of Kruger's criminal history would not have affected his advisory sentencing range, we need not decide whether the district court committed plain error in assigning the particular criminal history points that Kruger challenges.

We begin with the enhancement for use of a weapon in connection with the kidnapping. In order to show that the district court committed plain error which entitles him to relief, Kruger bears the burden of showing that the district court (1) committed error; (2) that is plain, in the sense that it is obvious in retrospect, *Olano*, 507 U.S. at 734, 113 S. Ct. at 1777; *United States v. Hamad*, 809 F.3d 898, 904 (7th Cir. 2016); and (3) that the error affects his substantial rights, in the sense that it made a difference to the outcome (in this case, his sentence), *Olano*, 507 U.S. at 734, 113 S. Ct. 1777-78; *Hamad*, 809 F.3d at 904. If he satisfies those criteria, then we as the reviewing court must consider whether the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings," such that it warrants the exercise of our discretion to correct the error. *Olano*, 507 U.S. at 732, 113 S. Ct. at 1776 (internal bracketing, quotation marks, and citations omitted); *see also United States v. Ramirez*, 182 F.3d 544, 547 (7th Cir. 1999). *See also Molina-Martinez*, 136 S. Ct. at 1343.

Guidelines section 2A4.1(b)(3) calls for a two-point enhancement if a dangerous weapon was used in connection with a kidnapping. Application note 2 to this guideline states, "'A dangerous weapon was used' means that a firearm was discharged, or a 'firearm' or 'dangerous weapon' was 'otherwise used' (as defined in the Commentary to § 1B1.1 (Application Instructions))." There is a parallel provision in the robbery guideline that likewise references section 1B1.1. *See* U.S.S.G. § 2B3.1(b)(2)(D) & comment. (n.1). Application note 1(I) to section 1B1.1 in turn instructs that "otherwise used" in conjunction with a firearm "means that the conduct did not amount to the discharge of a firearm but was more than

brandishing, displaying, or possessing a firearm or other dangerous weapon." The term "brandished" is in turn defined to "mean[ ] that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." § 1B1.1, comment. (n.1(C)).[2] As we noted above, when Kruger kidnapped Walter Reidl, he took both a shotgun and handgun with him in the truck, placing the handgun in his lap. Kruger argues that the placement of the gun in his lap at worst amounted to brandishing of the firearm (and possibly only displaying) but did not rise to the level of "use" of the firearm.

The district court committed no obvious error in finding that Kruger otherwise used a firearm in kidnapping Walter. As we have previously acknowledged, the language of the relevant guidelines and the accompanying commentary provides no clear guidance on what will distinguish mere brandishing of a weapon from other use, short of actual discharge of the weapon, that will qualify for the enhancement. *United States v. Eubanks*, 593 F.3d 645, 650 (7th Cir. 2010) (citing *United States v. Hernandez*, 106 F.3d 737, 741 (7th Cir. 1997)). Our cases have looked for conduct that "create[s] a personalized threat of harm," *Eubanks*, 593 F.3d at 651 (quoting *United States v. Warren*, 279 F.3d 561, 563 (7th Cir. 2002)) (bracketing ours); *see also United States v. Taylor*, 135 F.3d 478, 483 (7th Cir. 1998), as when the defendant levels a gun at a specific individ-

---

[2]   The definition concludes with the observation that "although the dangerous weapon does not have to be directly visible, the weapon must be present." § 1B1.1, comment. (n.1(C)).

ual and in some way conveys a threat, explicit or implicit, that he will inflict harm on that person if she does not cooperate with him, *Hernandez*, 106 F.3d at 741. *See Eubanks*, 593 F.3d at 651 (defendant pointed gun at specific jewelry store employee and forced employee to ground); *Warren*, 279 F.3d at 563 (defendant grabbed bank teller by arm, put gun in her back, ordered her into vault room, and told her he did not wish to hurt her); *Taylor*, 135 F.3d at 483 (defendant poked bank teller in back with gun after he told her to open safe and she hesitated); *Hernandez*, 106 F.3d at 741 (defendant and his accomplices forcibly kidnapped victim and held him at gunpoint); *United States v. Seavoy*, 995 F.2d 1414, 1422 (7th Cir. 1993) (defendant pointed firearm at faces and heads of bank tellers and customers and ordered them to ground, and was overheard threatening their lives to an accomplice).

In this case, one could plausibly conclude that Kruger's actions leading up to and during the kidnapping created a specific threat of harm to Walter Reidl in order to secure his cooperation. True, there is no evidence that, as Kruger and Walter left the farm in Walter's truck or at any point thereafter, Kruger pointed the gun specifically at Walter and/or expressly threatened to shoot him if he did not follow Kruger's orders. But as we pointed out at argument, it is inappropriate to isolate the kidnapping phase of the encounter between Kruger and the Reidls from the broader *res gestae*. On arrival at the Reidls' farm, Kruger had pointed the gun at Mrs. Reidl, implicitly threatening her life. After Walter arrived on the scene and the three of them were discussing religion, Kruger expressly threatened to kill both Mr. and Mrs. Reidl as well as himself. It was against that backdrop that Walter suggested he go with

Kruger to Bloomington—he wanted Kruger to leave his wife behind in safety. Kruger agreed, but he took both the rifle and the handgun with them in Walter's truck, and kept the handgun at the ready in his lap. Given what had transpired, Walter would have understood that his life remained in danger as the two departed the farm. More to the point, Walter (and anyone in his position) would have understood the visible presence of the gun in Kruger's lap as communicating a continuing threat to harm him if he did not cooperate. There is no question that Kruger had Walter under his control: Walter at one point asked to be let go and Kruger refused. Only when he took refuge in the taxidermy shop after being sent to obtain more soda for Kruger was he able to escape. Under these circumstances, the district court committed no obvious error in finding that Kruger did not simply brandish a weapon during the kidnapping, but overtly used the firearm to intimidate Walter and convey an implicit threat to harm him (echoing the express threats he had made earlier) if Walter attempted to escape or did not comply with Kruger's orders.

With that point settled, we turn to the criminal history points that Kruger maintains were assigned to him in error. As we noted above, Kruger was assessed one criminal history point for a Wisconsin case in which Kruger was convicted of operating a motor vehicle on September 10, 2013, while under the influence of a controlled substance. R. 127 ¶ 84. He argues that this was erroneously treated as part of his prior criminal history when, in fact, the underlying conduct was part of the offense of conviction in this case. Kruger was assessed an additional two points pursuant to Guidelines section 4A1.1(d) because the offense conduct charged in Count Two—the

possession of the rifle and ammunition between August 14 and August 28, 2013—occurred while he was still serving a criminal justice sentence (including probation) on a prior conviction. R. 127 ¶ 87; *see* R. 138 at 4; R. 140 at 4-5. This was error, Kruger maintains, because he was discharged from probation on the prior offense (a disorderly conduct conviction) on August 16, 2013, and the record does not confirm that any portion of the offense charged in Count Two—or anything that might qualify as relevant conduct—actually occurred prior to August 16.[3]

Even if Kruger were correct that all three of these points were assigned in error, however, it would have no effect on his advisory sentencing range. Recall that Kruger's adjusted offense level of 38, coupled with a criminal history category of III, produced a sentencing range of 292 to 365 months. But because that range exceeded the statutory maximum term of 240 months, the statutory maximum became the Guidelines sentencing range. U.S.S.G. §§ 5G1.1(a); 5G1.2(d). As the parties

---

[3]   In his written challenges to the pre-sentence report, Kruger did offer a "clarification," noting that the basis for the additional two history points emanated from relevant conduct rather than from the conduct charged in Count II itself. R. 125 at 2 ¶ 86. (The district court characterized this clarification as an objection, R. 138 at 4; R. 140 at 5, but that is not how Kruger himself labeled it.) Kruger now argues on appeal that the conduct charged in Count I of the superseding indictment, relating to his purchase and possession of the rifle and ammunition in June, does not constitute relevant conduct vis-à-vis his possession of the same gun and ammunition the following August as charged in Count II, as the district court evidently assumed. This was not an argument he made below. Even if we deemed his clarification (and the district court's treatment of it) sufficient to have preserved this point, it would not be necessary for us to resolve his argument on its merits, for the same reasons we discuss below.

agree, only if Kruger were to succeed on all of the issues he has raised in this appeal would the advisory Guidelines range drop even partially below 240 months. (If his adjusted offense level were 36, and his criminal history category II, the range would be 210 to 262 months, with the statutory maximum capping the upper end of that range at 240 months.) But we have already concluded that it was not plainly erroneous for the district court to apply the two-level enhancement for use of a weapon in conjunction with the kidnapping; and that is the only challenge that Kruger has made to his offense level. Even if we went on to find error with respect to each of the three criminal history points he has challenged, such that his criminal history category would drop to II, his sentencing range, although it would drop to 262 to 327 months, would remain substantially above the statutory maximum. Consequently, his advisory sentencing range would remain at 240 months—precisely the same range that the district court consulted in arriving at an appropriate sentence for Kruger. The district court of course imposed a sentence substantially lower than that (180 months); but the point is that its reference point—the advisory Guidelines range[4]— was exactly the same as it would have been if Kruger's criminal history category were II rather than III.

In short, Kruger has not shown that he was prejudiced by any error in the assessment of his criminal history category. As any such error did not affect the advisory sentencing range, there is no likelihood that he would have received a different

---

[4]  "[T]he Guidelines are to be the sentencing court's 'starting point and … initial benchmark.'" *Molina-Martinez, supra,* 136 S. Ct. at 1345 (quoting *Gall, supra,* 552 U.S. at 49, 128 S. Ct. at 596).

sentence absent the error. *Compare Molina-Martinez*, *supra*, 136 S. Ct. at 1345 (application of incorrect sentencing range resulting from forfeited error normally is sufficient by itself to establish substantial prejudice); and *United States v. Paz-Giron*, 2016 WL 4376495, at *3 (7th Cir. Aug. 17, 2016) (miscalculation of sentencing range is ordinarily sufficient to establish prejudice for purposes of plain-error review); *with United States v. Fletcher*, 763 F.3d 711, 718 (7th Cir. 2014) (any *ex post facto* error that district court may have committed in relying on more punitive version of Guidelines post-dating defendant's offense to calculate his sentencing range was harmless; "[b]ecause the court was constrained by the statutory maximum under either version of the guidelines, any error in calculating the range for Count I could not have affected the district court's choice of a sentence …").

## III.

For the foregoing reasons, we AFFIRM Kruger's sentence.