In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 06-3620

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

COREY L. WILLIAMS,

*Defendant-Appellant*.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-10091-001—**Michael M. Mihm**, *Judge*.

_____

ARGUED SEPTEMBER 5, 2007—DECIDED APRIL 14, 2008

_____

Before EASTERBROOK, *Chief Judge*, and WOOD and EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Corey Williams pleaded guilty to armed robbery, 18 U.S.C. §1951, and possessing a firearm during a crime of violence, 18 U.S.C. §924(c)(1). He has been sentenced to 290 months' imprisonment. His conditional plea, see Fed. R. Crim. P. 11(a)(2), reserved the right to challenge the district court's ruling that the testimony of eyewitnesses would be admissible at trial. Powerful evidence connected Williams to the robbery independent of any eyewitness, so it is not clear that he had much to gain by his motion to suppress the identifica-

tions, but as there was no error we need not decide whether it would have been harmless.

Four eyewitnesses to the crime viewed a lineup that contained six persons of roughly the same height (from five feet six inches to five feet nine inches), facial hair, build, and skin color as one of the two robbers who had been described to police immediately after the crime. The six were dressed in identical prison garb. The officer conducting the lineup told the witnesses not to assume that one of the participants was a suspect, and not to assume that the officer knew the suspect's identity (if a suspect was present). Three of the witnesses identified Williams as a robber. (The fourth did not identify anyone.) The officer obtained statements from each witness about their degree of confidence (which ran from 99.9% for the most confident witness to "five or six out of ten" for the least).

The basis of the motion to suppress the identification and prevent the witnesses from identifying Williams in court is that, while five of the six participants in the lineup wore navy blue slippers, the sixth wore white tennis shoes. The person wearing the tennis shoes was Williams. This made him stand out, counsel contended, and increased the chance that he would be identified as the robber—especially because the eyewitnesses had described one robber as wearing white tennis shoes. Having just one participant wear white tennis shoes made the lineup unduly suggestive, Williams insisted. But the district judge concluded that nothing in the record implied that shoes, as opposed to facial characteristics and build (and, for one witness, the suspect's voice), played a role in the identifications.

Williams's only argument on appeal is that the white tennis shoes made the lineup unduly suggestive. If this is

so, Williams still loses, because suggestiveness is only part of the legal standard. Eyewitnesses should be prevented from identifying a suspect in court only if the pretrial procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification*." Simmons v. United States*, 390 U.S. 377, 384 (1968). *Simmons* said this about a photographic procedure; the same standard was applied to showups and lineups by *Neil v. Biggers*, 409 U.S. 188, 198 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). (*Neil* said that the "irreparable" part of the inquiry applies only to testimony, so an identification made at the lineup itself could in principle be excluded even when the witness is allowed to identify the defendant at trial, but Williams makes nothing of this.)

Misidentification is "irreparable" when the source of the error is so elusive that it cannot be demonstrated to a jury, which therefore will give excessive weight to the eyewitness testimony. Williams has never tried to show that the effect of white tennis shoes is something that operates subconsciously, so that witnesses will be unshakeable in their errors, or that jurors would be unable to understand what happened and react appropriately. Unless the misidentification is irreparable, there is no basis for blocking the testimony. Perceptual biases and errors are endemic to identification. See Elizabeth F. Loftus, *Eyewitness Testimony* (1979); Daniel L. Schacter, *The Seven Sins of Memory* 88–137 (2001). The normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence.

All questions about "irreparability" to one side, was this lineup unduly suggestive in the first place? That

depends on how clothes affect identification. Will giving one participant an article of clothing that matches the description of the offender lead a witness astray? Williams's lawyer says yes; when asked why at oral argument, counsel replied "Common sense." The prosecutor says no; when asked why at oral argument, counsel replied "Common sense."

If there is one thing known about eyewitness identification, it is that "common sense" misleads more often than it helps. See *United States v. Brown*, 471 F.3d 802 (7th Cir. 2006) (discussing some of the evidence). See also, e.g., Gary L. Wells & D.M. Murray, *What can psychology say about the Neil v. Biggers criteria for judging eyewitness identification accuracy?*, 68 J. Applied Psych. 347 (1983); Timothy P. O'Toole & Giovanna Shay, *Manson v. Brathwaite Revisited: Towards a New Rule of Decision for Due Process Challenges to Eyewitness Identification Procedures*, 41 Val. U.L. Rev. 109 (2006). The problem with "common sense" is that experience tells us what leads to *confidence* about whether we have seen a given person before but does not provide reliable ways to test whether that confidence is justified. People confuse certitude with accuracy and so are led astray. Psychologists have established that certitude often is unwarranted. It takes data rather than intuition to answer questions such as "can non-uniform footgear in a lineup lead to misidentification?"

We directed the parties to file post-argument memoranda addressing the social-science literature. The United States filed a helpful memorandum; Williams's counsel informed us that he had nothing to add and thus surrendered the opportunity to provide any empirical support for his submissions. Perhaps there is none to be had. The studies collected by the United States discuss optimal

identification procedures (our opinion in *Brown* discusses some of this work) but do not address the question at hand: do differences in the clothes worn by participants in lineups lead to false identifications?

What we do learn from the studies is that the police acted prudently in telling the witnesses that the lineup may have contained no suspect at all, and that the officer conducting it may be ignorant of the suspect's identity. Those steps reduce the chance that witnesses will choose someone even though they don't remember his face, or may follow cues from the officer rather than rely entirely on their memories. See Gary L. Wells, *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 L. & Human Behavior 603, 627–29 (1998); Nancy M. Steblay, *Social Influence in Eyewitness Recall: A Meta-Analytic Review of Lineup Instruction Effects*, 21 L. & Human Behavior 283, 284–85 (1997). Obtaining immediate estimates of confidence also reduced the chance of error. People often profess greater confidence after the fact; their memories realign to their earlier statements, so that trial testimony may reflect more confidence than is warranted. Contemporaneous estimates of confidence reduce that risk. See Wells, *Eyewitness Identification Procedure*s, 22 L. & Human Behavior at 630. These conclusions support the district court's ruling, and the lack of evidence about the effects of clothing leaves Williams without any way to undermine that ruling.

One more thing is worth mention. Three witnesses identified the same person at the lineup, although they viewed the lineup separately and there was no risk that one person's identification would influence the others. The fourth did not identify anyone and could not have been led astray by the tennis shoes. Counsel have briefed this

appeal as if it involved only one witness, but the number of identifications supplies valuable information. Even if the risk that any one identification would be mistaken is substantial, the risk that multiple witnesses would make the same error is smaller. See *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003). How much smaller? Does a cue (such as white shoes) that points to one participant affect all witnesses, or are errors independent? If the individual-witness error rate is 0.3, the risk that three people will make the same mistake is 0.3 to the third power, or 0.027, if the errors are independent. Are they? None of the briefs mentions this question, and the prosecutor's supplemental filing does not address it. When multiple witnesses make the same identification, it is essential to know how likely it is that a given misidentification will recur. That, too, is a subject for empirical inquiry.

This is not at all to say that counsel must present experts, or even social-science evidence, in every case. Instead judges should take account of these matters when thinking about the issue and informing juries. See *United States v. Hall*, 165 F.3d 1095, 1118–20 (7th Cir. 1999) (concurring opinion). Often the right disposition will be evident with or without the aid of social science. But when lawyers' talk is the only thing presented to the judge—as it was here—there will rarely be a basis for overturning the outcome, whichever way it goes. The district judge did not err, so the conviction and sentence are

AFFIRMED.

EVANS, *Circuit Judge*, concurring.  I join Chief Judge Easterbrook's opinion in this case because it is abundantly clear that Judge Mihm was correct when he found that the lineup was not unduly suggestive. Because Williams can't get to first base, he can't get beyond that and establish that the lineup created a substantial likelihood that a misidentification would occur.

I write separately simply to note that the majority opinion gives, in my view, a bad rap to "common sense." I don't think Williams' counsel or the prosecutor were out of line when they answered "common sense" (of course, what's common sense to one can be nonsensical to someone else!) during oral argument. Assume, for example, that a bank is robbed and several tellers report that the robber was wearing a green sweatshirt with "Girdwood, Alaska" on the front. Assume further that a day or two later the tellers viewed a lineup with six men, all roughly the same height, weight, and race of the robber, but one was wearing a green sweatshirt with "Girdwood, Alaska" on the front. Common sense tells me that the lineup would be unduly suggestive. Scientific studies would not be needed to make that point. Here, Williams in white tennis shoes, while the others wore navy blue slippers, is rather trivial—his shoes are a long way away from the Girdwood, Alaska, green sweatshirt. Common sense tells me that the shoes Williams wore did not make his lineup unduly suggestive.