In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1932

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CONRAD GONZALEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:13-cr-50074-1 — **Frederick J. Kapala**, *Judge.*

ARGUED FEBRUARY 6, 2017 — DECIDED JULY 10, 2017

Before ROVNER and WILLIAMS, *Circuit Judges*, and CONLEY, *District Judge.*[*]

ROVNER, *Circuit Judge.* A jury found Conrad Gonzalez guilty of bank robbery. Gonzalez challenges his conviction on due process grounds, arguing that the identification proce-

[*] Of the Western District of Wisconsin, sitting by designation.

dures employed by police officers in the investigation of the robbery were so unnecessarily suggestive that they created a substantial likelihood of irreparable misidentification. Although we agree that there were significant problems with the challenged identification procedures, we conclude that any error in admitting them was harmless.

**I.**

Shortly after 1:00 p.m., on October 30, 2013, a man walked into First Federal Savings Bank in Rock Falls, Illinois, approached the counter and handed the teller a note. The note stated, "This is not a joke: I want all your 100K & 50K. I have a weapon and will use it." Tara Miller, the teller, handed over all of the $50 and $100 bills in her drawer. The robber became angry, told her "not to be stupid," and demanded more money. Miller then handed over all of her $20 bills, including some bait bills with serial numbers that had been recorded by the bank. The robber left the bank with $1870. Miller immediately told her manager that the bank had just been robbed, locked the front doors of the bank, and then triggered the silent alarm. Another employee of the bank called 911. Fewer than two minutes had elapsed since the robber had entered the bank.

Before the police arrived, Miller filled out a "Bandit Description Form" provided by the bank. On a line requesting the location of the employee in relation to the robber, she wrote, "Standing right in front of me," a distance she later judged to be approximately two feet. Because the robber stood so close and because the robbery occurred in the broad daylight of early afternoon, Miller had a clear view of the man.

On the Bandit Description Form, she described the robber as Hispanic, approximately 35 to 40 years old, five feet seven inches tall and weighing between 130 and 150 pounds. She reported that the man had a shaved head (she bypassed a box on the form for "bald" and wrote in "shaved") and "scraggly" facial hair. He was wearing a blue baseball-style cap and a grey sweatshirt. At first, she thought he had a check in his right hand but that turned out to be an envelope containing the note demanding money. He held a cell phone in his left hand. After she handed over the money, he placed it in the plain white envelope. When she tried to keep the demand note, the robber quickly grabbed it back. She described the robber as "nervous, quiet speaking, very gruff and demanding."

The silent alarm had been pulled at 1:11 p.m. and several police officers arrived at approximately 1:15 p.m. from the Rock Falls and neighboring Sterling Police Departments. Sergeant Herb Hall of Rock Falls had a hunch based on the initial description of the robber that Conrad Gonzalez might be involved. He passed on his suspicion to Commander Tammy Nelson. She then provided black and white printouts of Gonzalez's driver's license and state identification card to Lieutenant Timothy Morgan, who had been one of the first officers to arrive on the scene. Morgan and Nelson decided that the investigation could be expedited by showing the photographs to the bank teller, Tara Miller. Approximately twenty minutes after Morgan arrived at the bank, he showed the printouts to Miller. The photographs were of poor quality, grainy, dark, of low resolution and printed on plain office paper. They had been taken approximately three years earlier. Miller knew that Morgan was showing her photographs of a

potential suspect. She told the officer that she did not recognize the person in the photographs, although she thought one of the photographs depicted a man with features similar to those of the robber.

After the photographs were shown to Miller, Detective Douglas Wolber arrived at the bank and took charge of the investigation. He spoke with Miller, heard her description of the robber, and reviewed the bank's surveillance tape. He also suspected that Gonzalez was involved. Wolber knew that Gonzalez and his girlfriend, Kelly Mewhirter, had been involved in other bank robberies.

The robbery was reported in the local media and the police released a still image taken from the bank's video surveillance system. On the same day as the robbery, Melissa Summers, a sandwich artist at a Subway sandwich shop four blocks from the bank, saw the photo and recognized the sweatshirt that the robber was wearing.[1] Earlier that day, when working at Subway, she had seen a Chicago Bears sweatshirt in Subway's dumpster. She noticed that the sweatshirt was in good condition, and not the sort of thing she expected to find in the trash. She mentioned it to a co-worker, who called her later that evening and told her it might belong to the person who robbed

---

[1] "Sandwich artist" is the term that Subway uses for employees who greet and serve customers, prepare food, maintain food safety and sanitation standards, and process light paperwork. Sandwich artists are responsible for cleaning and maintaining all areas of the restaurant, which is presumably what Summers was doing when she encountered the sweatshirt in the store's dumpster. *See* https://apply.mysubwaycareer.com/us/en/job-descriptions/sa-job-description/ (last visited June 30, 2017).

the nearby bank. Summers then looked at a photo of the robber on the internet. After seeing the same sweatshirt in that photo, she contacted the police department. An officer retrieved the sweatshirt from the dumpster and found three $20 bills in the pocket.

Summers and her co-worker were not the only people who noticed a connection between the sweatshirt and the bank robber. The day after the robbery, Pat and Katie Mewhirter also contacted the police after seeing the still image of the bank robber in a report on the internet. Katie is the sister of Kelly Mewhirter and Pat is the mother of Kelly and Katie. Kelly Mewhirter had been involved with Gonzalez and had a child with him. Pat had given Gonzalez an identical Bears sweatshirt for Christmas some time before the robbery. She had given similar sweatshirts to other members of the family. Pat and Katie told the police that they thought the robber in the still image resembled Gonzalez. They also told the police that Gonzalez had lost a considerable amount of weight since the driver's license photo had been taken. Katie directed an officer to a more recent photograph of Gonzalez on Facebook. At trial, defense counsel asked Pat Mewhirter how she recognized Gonzalez in the photo, whether it was because of the individual's face, build or sweatshirt. She replied, "I'm recognizing pretty much everything." R. 120, at 409. When pressed to admit that the photo did not show the robber's face well enough to identify him, Pat Mewhirter replied that, "It just looks like Conrad." She explained how she could tell it was Gonzalez:

> Just by how he is standing and—Everything about it. It just is familiar to me. And I can almost see it, but I can't see his face. But his feet, his legs. I

just—everything about the picture reminded me of
Conrad. I'm sorry.

R. 120, at 409.

Armed with the identification from Katie and Pat
Mewhirter, Detective Wolber prepared a photo lineup. He
downloaded from Facebook a more recent photograph of
Gonzalez and five other photographs of men whom he
believed fit Miller's description of the robber.[2] Unfortunately,
Wolber had never been trained in putting together a photo
lineup, and there were some problems with the array that we
will discuss below. Two days after the robbery, Detective
Wolber showed the six-man, color photo array to Miller after
giving her a warning that the robber might not be in the array
and that she was under no obligation to identify anyone. Miller
quickly identified Gonzalez as the bank robber, telling Wolber,
"I knew for sure it was that individual because I could feel the
chills going up and down my spine just from the incident."
R. 119, at 198. Miller also unequivocally (and repeatedly)
identified Gonzalez at trial as the person who robbed the bank.

---

[2] In its brief, the government describes the Facebook photos in the array as
"all taken from the same source." But Facebook is a conglomeration of
literally hundreds of millions of sources of photographs. To the extent the
government meant to imply that the "same source" of the photographs
provided some uniformity that lessened the risk of drawing attention to any
one picture, Facebook does not aid the argument. If all photographs are
drawn from a database of drivers' licenses or passport photos, for example,
there might be an argument that uniformity lessens the risk of highlighting
a particular photo. There is some uniformity here in the sense that the
Facebook photos were cropped to show only the head and neck of each man
but that is the end of the similarity.

Miller's identifications were not the only evidence against Gonzalez presented at trial. Gonzalez had significant problems with his alibi for the day of the robbery. Both Gonzalez and Kelly Mewhirter were addicted to controlled substances and alcohol. In fact, just six days after the robbery, Gonzalez admitted to an Evanston detective that he was addicted to crack cocaine and that his addiction was "out of control." R. 120, at 539. As a result of their addictions, Gonzalez and Kelly Mewhirter were unable to care for their daughter and neither had custody. Pat Mewhirter and her husband cared for their grandchild and Gonzalez had supervised visitation rights. The Mewhirters lived in Rock Falls and Gonzalez lived in Evanston, some 120 miles away. Gonzalez was scheduled to visit his daughter on the day of the robbery, from 1:00 to 3:00 p.m. He had arranged to meet Jessica Wade and his daughter at a Rock Falls McDonald's, a frequent meeting place for his supervised visits. Wade was a case aide worker in the Youth Services Bureau, a contract agency for the Department of Children and Family Services. That McDonald's is just four blocks from the bank and is next door to the Subway sandwich shop where Melissa Summers found the Bears sweatshirt that she recognized from the photo of the robber released by the police.

Prior to the day of the robbery, Gonzalez had been very consistent in visiting his daughter, usually arriving before the case worker at the agreed location. Wade had supervised nine or ten visits between Gonzalez and his daughter in the previous five months. For a typical visit, Gonzalez would spot Wade's car pulling into the parking lot and would exit his car to greet his daughter. He would then help her out of Wade's

car and take her into McDonald's for the visit. Wade accompanied Gonzalez and his daughter into the restaurant in order to supervise each visit.

On the day of the robbery, however, the visit was anything but typical. Wade arrived at the McDonald's shortly before 1 p.m. with Gonzalez's daughter. But this time, Gonzalez was not there to greet them. When Wade did not see Gonzalez's car in the parking lot, she called him and left a message to let him know that she was at the agreed place with his daughter. Phone records confirmed that call at 12:57 p.m. Wade always kept detailed records of her supervised visits, noting anything unusual. She wrote down text messages verbatim and summarized phone calls. Because Gonzalez had never missed a visit, she recorded all of her communications with him that day. She noted that, after leaving the voicemail, she received a text from Gonzalez at 1:05 p.m., saying, "I will have to get back to you by 1:40 to determine if I'll be able to see now Nat [his daughter]. Thank you." R. 120, at 488. Wade immediately texted back, "Does that mean you won't be here 'til at least 1:40? Do we need to reschedule?" R. 120, at 489. At 1:07, Gonzalez texted back, "I am in the middle of something right now. I don't have to get back to. Thank you." R. 120, at 489. Wade texted back, "Okay." She did not hear from him again until 1:40, when he texted, "I'm in right now taking care of something. I would let you know. Thank you." Immediately after that, he texted, "I will be there by 3:15. Thank you. And I will see you there." R. 120, at 490. Wade replied, "Conrad, I am sorry but when I texted you I said this visit would have to be 1:00 to 3:00, and you responded that you were fine with that. I have another appointment at 3:15. I'm sorry, but will have to do visit

tomorrow or Friday. Let me know." R. 120, at 490–91. Gonzalez then called Wade (it was now 1:44 p.m.) and said he thought the visit was from 3:00 to 5:00. He apologized and said he was having trouble with family. Wade offered a visit on Thursday or Friday. Gonzalez told Wade he was upset that he was not having the visit and asked her to tell his daughter he said "hi." R. 120, at 491–92. By the time Wade received that call, she had left McDonald's and was in the driveway of the Mewhirters' home, which was only a few blocks away. At 3:57 p.m.,[3] she received one more text from Gonzalez, saying, "They are paying me on my visit now. They said it was from 1:00 to 5:00 not 3:00 to 5:00." R. 120, at 495–96. Gonzalez did not reschedule the visit. Wade did not hear from him again.

Gonzalez testified in his own defense and his account of the day of the robbery cannot be easily reconciled with Wade's carefully documented report. According to Gonzalez, he arrived in Rock Falls the night before the visit and stayed in a hotel. Although he regularly stayed in this hotel when visiting Rock Falls, he could not recall the name of it. He woke up at about 9:00 a.m., left the hotel at about 10:30, ate some snacks at a picnic area and went fishing at a canal. From maps presented at trial, the fishing area appears to be approximately thirteen blocks from the McDonald's and approximately nine blocks from the bank. He testified that he believed the visit was scheduled from 3:00 to 5:00, not 1:00 to 3:00. When he received

---

[3] In her hand written notes taken that day, Wade placed a question mark next to the time that this last text arrived, perhaps indicating she was uncertain of the precise time. Her description of the text appears at the very end of her notes, after her account of the final phone call from Gonzalez.

the 12:57 p.m. voicemail from Wade saying that she was at
McDonald's, he explained that he sent back a text saying he
would get back to her at 1:40 because he needed time to get his
things together and prepare to see his daughter. He had to
gather his fishing pole, his tackle box and other items. His texts
were somewhat garbled, he explained, because he dictated his
texts into the phone rather than typed them. At 1:07, he meant
to text that he was in the middle of driving. He had decided to
head to the McDonald's immediately. According to a surveil-
lance camera in the McDonald's parking lot, Gonzalez's car
entered the lot at 1:11:40 p.m. He testified that he drove around
the parking lot, did not see Wade's car, and so parked and
went into the McDonald's. The surveillance video showed his
car leaving McDonald's at 1:38 p.m. He told the jury that he
ordered food for himself and his daughter, looked at the play
area, did not see Wade or his daughter and so he sat down and
ate. His 1:40 text was meant to convey that he was at the
restaurant, even though it said nothing of the sort and by his
own admission, he had just left the restaurant at the time he
sent the text. He testified that before he sent the 1:40 text, he
sent a text saying that someone was playing a game with him,
that Wade had told him the visit was from 3:00 to 5:00. This
was apparently the text that Wade recorded as coming in a few
hours later. There is no such text at that time shown on Gonza-
lez's phone records, which otherwise account for all of the texts
recorded by Wade. He told the jury that this text, in combina-
tion with the 1:40 text saying, "I'm right now taking care of
something. I would let you know," meant that he was leaving
McDonald's because he believed that the Mewhirters were
playing a game with his visits. When asked to explain the

"something" he was "taking care of," he said he left because he was uncomfortable with the situation and wanted to discuss it with his family. He could not explain why he did not text or call Wade to tell her that he had arrived at McDonald's, except to say that he was upset with the Mewhirters. Yet later that day, he placed $300 on Kelly Mewhirter's debit card. He conceded that he set his visits up with Wade and that he did not believe Wade was involved in any games the Mewhirters were playing with him. He denied that the sweatshirt recovered from the Subway dumpster (Subway's parking lot was adjacent to McDonald's parking lot) was the same as the sweatshirt he received from Pat Mewhirter. But the jury was presented with a photo of Gonzalez holding the sweatshirt on Christmas day and photos of the sweatshirt recovered from the dumpster, and they appear identical.

There was still more evidence against Gonzalez. On October 26, 2013, only four days before the robbery, Gonzalez was with Kelly Mewhirter, his sometime girlfriend and the mother of his child. Kelly, who herself had a criminal record for bank robbery, robbed a restaurant in Sterling, Illinois on that day. Shortly after the restaurant robbery, she and Gonzalez drove to Evanston. Along the way, they were stopped for speeding, and Gonzalez was issued a ticket. They also stopped at a gas station where surveillance cameras captured images of them. Gonzalez was wearing the same Bears sweatshirt worn by the bank robber four days later, the same sweatshirt shown in a photo of Gonzalez on the Christmas day he received it as a gift. Kelly, an admitted addict, used the money from the restaurant robbery on alcohol and drugs. After the bank robbery, police officers came to her home and showed her

videos from the bank's surveillance camera. Kelly told the officers that she recognized the person robbing the bank as Gonzalez, based on the way the robber moved, and the sweatshirt and hat that he was wearing. She recognized the hat as possibly belonging to her boyfriend, Jonathon Wilson. (Wilson later testified that he could not find his hat after Gonzalez had stayed at Wilson's home.) Kelly also reluctantly admitted that, a few weeks before the bank robbery, Gonzalez had pointed out the bank to her as a place where "things would be easy," and had told her that the road behind the bank would be easy to drive down. R. 120, at 284–85. That road, coincidentally, led directly to the McDonald's where Gonzalez was scheduled to visit his daughter, and the Subway sandwich shop where the sweatshirt was later recovered, with money stuffed in the pockets. Kelly also testified that, on the day of the robbery, Gonzalez deposited $300 on a debit card for her, an unusual amount because Gonzalez rarely gave her more than $20 at a time due to her struggles with alcohol and controlled substances. The amount was also unusual because Gonzalez had recently lost his job.

Kelly's testimony was not without its problems: the jury was informed that Kelly had received a reduced charge and reduced sentence in the restaurant robbery in exchange for cooperating in the bank robbery prosecution against Gonzalez. And Kelly admitted to memory problems because of her alcohol and drug use. Nevertheless, on the basis of this and other evidence, Gonzalez was convicted of one count of bank robbery. He was sentenced to 234 months' imprisonment. He appeals.

## II.

On appeal, Gonzalez challenges the district court's denial of his motion to suppress evidence and testimony relating to Tara Miller's in-court and out-of-court identifications of Gonzalez as the robber. He also contends that the court plainly erred when it admitted evidence that he asserts implicated him in Kelly Mewhirter's robbery of a restaurant four days before the bank robbery. He argues that this was propensity evidence that denied him a fair trial. The government denies (with one exception, noted below) that the police photo identification procedures were improper, and argues in the alternative that any error was harmless. The government also asserts that there was no plain error in admitting relevant evidence of Kelly Mewhirter's robbery of a restaurant.

## A.

Our review of the district court's decision to deny Gonzalez's motion to suppress Miller's identifications is *de novo*, with due deference to the court's findings of historical fact. *United States v. Harris*, 281 F.3d 667, 669–70 (7th Cir. 2002). *See also Ornelas v. United States*, 517 U.S. 690, 695–98 (1996). In determining whether a particular identification procedure violates a defendant's due process rights, courts first consider "whether the police used an impermissibly suggestive procedure in obtaining the out-of-court identification. If so, the second inquiry is whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977). *See also Simmons v. United States*, 390 U.S. 377, 384 (1968); *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009).

The government concedes that the photo show-up, that is, the display of Gonzalez's driver's license and state identification card photos to the teller within minutes of the robbery, was both suggestive and unnecessary. The display was based on an officer's hunch, according to candid law enforcement testimony. Photographs of only one suspect were displayed, telegraphing to Miller that the police thought this was the robber. *See Simmons*, 390 U.S. at 383 (the danger of misidentification increases if police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him pictures of several individuals where the photo of a single individual recurs or is in some way emphasized); *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (noting that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned"); *United States v. Sanders*, 708 F.3d 976, 985–86 (7th Cir. 2013) (noting that in-person show-ups are inherently suggestive but reserving the question of whether a photographic show-up presents the same problem). Indeed, at the suppression hearing, the court asked Miller if she assumed that the officer "was showing [her] pictures of somebody that somebody believed had robbed the bank," and she replied, "A potential, yes." R. 44, at 126. Because the show-up was based on a hunch, and because Lieutenant Morgan testified that it would have taken only twenty minutes to compose a six-person photo lineup, there was no exigency justifying such a suggestive procedure. This was not a situation, for example, where the sole witness was so critically injured that her survival was in doubt, and she was unable to travel to the police station for a traditional lineup. *See Stovall*, 388 U.S. at

302. *But see Sanders*, 708 F.3d at 986–87 (noting that exigent circumstances might justify a photo show-up when an armed suspect is on the loose, clues point to a particular suspect, and the show-up occurs within a few hours of the crime).

In any case, Miller did not identify either of the photographs of Gonzalez as depicting the robber. Gonzalez contends, however, that the show-up tainted Miller's review of the six-person photo lineup that the officers staged two days later. Before addressing that claim of taint, we note that the six-person photo lineup presented its own problems. Recall that Miller described the robber as a Hispanic man, thirty-five to forty years of age, with a shaved head and scraggly facial hair. Two of the lineup photographs are so dark that it is difficult to discern facial features with any certainty. In both of those photos, because of the lighting and the angles at which the pictures were taken, it is difficult to see either man's head to determine the state of his hair. Two of the men pictured have hair that cannot be fairly described as "shaved." One of those men is too old for the age range given, and the other is too young. Although both have facial hair, neither can be described as "scraggly." Of the remaining two men, Gonzalez's photo is the clearest and brightest on the page.[4] In our view, the six-person photo lineup was suggestive in and of itself. That Miller had seen two photographs of Gonzalez only two

___

[4] The color photocopy of the six-person array attached to the defendant's brief is of poor quality, and we base our assessment on the actual page viewed and initialed by Tara Miller. We do not mean to imply that counsel purposefully altered the copy; darkening and distortion is a common problem with photocopies of color pictures.

days earlier lends weight to a conclusion that the entire process was unnecessarily suggestive.

A magistrate judge who conducted the suppression hearing saw the photo array differently, finding that "[a]ll six photographs in the array were similar to the description Ms. Miller provided on the bank form immediately following the robbery." R. 49, at 10. Noting that the police are not required to search for identical twins when composing a photo lineup, the magistrate judge ultimately concluded that nothing in the lineup drew any improper attention to the photo of Gonzalez. The judge also found that the number of photos presented was adequate, and that the array was presented in a neutral manner. *See United States v. Williams*, 522 F.3d 809, 811 (7th Cir. 2008) (noting that police officers reduce the chance of misidentification when they warn witnesses that a lineup may contain no suspect at all). In short, the magistrate judge concluded the array was not suggestive, that it was necessary, and that even if it had been suggestive, Miller's identification was nonetheless reliable and admissible under the totality of the circumstances.

The district court adopted the findings of the magistrate judge over the defendant's objections, concluding that the photo array was not suggestive. But the court also noted that it would accept the ultimate conclusion of the magistrate's report and recommendation even if the photo array had been suggestive because Miller's identification was still reliable under the totality of the circumstances test. The district court found (as had the magistrate judge) that the "indicia of reliability [were] strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances,"

rendering the evidence admissible and leaving it to the jury ultimately to determine its worth. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).[5] In considering whether an identification made in suggestive circumstances is still reliable, courts consider: the opportunity of the witness to view the offender at the time of the crime; the witness' degree of attention; the accuracy of the prior description of the offender; the level of certainty exhibited at the confrontation; and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). *See also Perry*, 565 U.S. at 243–44 (listing additional factors bearing on the likelihood of misidentification, including the passage of time between exposure to and identification of the defendant, whether the witness was under stress when first encountering the suspect, how far the witness was from the suspect, whether the suspect carried a weapon, and the race of the suspect and the witness). As we explain below, we agree that Miller's identification evidence was reliable enough to be admitted, and that any error in admitting those identifications was, in any case, harmless.

In considering the totality of the circumstances test, the magistrate judge had the benefit of hearing testimony from Tara Miller regarding her identification of Gonzalez in the

---

[5] When we use the words "corrupting effect of the police-arranged suggestive circumstances," we do not mean to imply that the officers involved purposefully staged a suggestive photo array. Nothing in the record indicates anything other than a good-faith effort by officers not trained in arranging a photo array. *Perry* makes clear that "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure to be suggestive." 565 U.S. at 232 n.1.

photo array. According to that testimony, Miller stood only two feet from the robber and could clearly see his face. He did not wear a mask and the lighting was good. She observed the robber's face throughout the robbery, which lasted under two minutes. She watched his face closely enough to see that he was angry when he received less money that he expected. She was observant, noticing that he was carrying an envelope in one hand and a cell phone in the other. Immediately after the robbery, she described the robber as a thirty-five to forty year old Hispanic man, with a shaved head, scraggly facial hair, five feet seven inches tall, approximately 130 to 150 pounds, and wearing a grey sweatshirt. Gonzalez is a forty-five year old Hispanic man, five feet nine inches tall, approximately 180 pounds a few months later, with a shaved head and scraggly facial hair. Although the sweatshirt appears to be dark blue, it is a distinctly greyish hue of blue. Her description was remarkably close given the brief length of the incident and the stressful circumstances. The magistrate found that Miller's testimony was credible, clear, confident and compelling, all findings to which we owe deference. She confidently identified Gonzalez only two days after the robbery, and within twenty seconds of first seeing the photo array. The magistrate also discounted the tainting effect of the photo show-up on Miller's viewing of the six-person array, finding that the photos in the array were in color, of better quality and more recent than the photos used in the show-up. The color photo portrayed a slimmer man, consistent with the evidence that Gonzalez had lost a considerable amount of weight since the driver's license and identification card photos had been taken. Moreover, Miller testified that when she viewed the photo array, she did

not think back to the previous photo show-up. The magistrate credited that testimony and concluded that the government had shown by clear and convincing evidence that Miller's identification of Gonzalez in the six-person array was sufficiently reliable to satisfy due process, especially because defense counsel could highlight the significant, but not unconstitutional, problems with the identification procedures at trial.

As we noted above, in our view, the six-person photo array was suggestive, but that is not the end of the inquiry. The Supreme Court has held that, when indicators of a witness's ability to make an accurate identification are not outweighed by the corrupting effect of the challenged identification, the evidence (if otherwise admissible) should be submitted to the jury. *Perry*, 132 S. Ct. at 725. Although there were significant problems with the identification procedures employed by the untrained officers, there was no error in the court finding that the evidence was reliable enough to go to the jury with the usual procedural safeguards of a trial in place. Misidentification is irreparable "when the source of the error is so elusive that it cannot be demonstrated to a jury[.]" *Williams*, 522 F.3d at 811. The normal way of dealing with the perceptual biases and errors that are endemic to eyewitness identification is "to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence." *Williams*, 522 F.3d at 811. Such was the case here, where defense counsel had every opportunity to reveal at trial any weaknesses in Miller's identifications of Gonzalez.

Perhaps more importantly, any error in admitting Miller's out-of-court and in-court identifications of Gonzalez was

harmless error at worst. *Sanders*, 708 F.3d at 988. An error in the admission of identification evidence is harmless if the remaining evidence would have persuaded any reasonable jury beyond a reasonable doubt of the defendant's guilt. *Sanders*, 708 F.3d at 988. First, there would be no reason to exclude from trial the description that Tara Miller provided on the Bandit Description Form, which she created moments after the robbery and prior to any corrupting influence of the photo show-up. *See United States v. Ford*, 683 F.3d 761, 767 (7th Cir. 2012) (even if a witness is not allowed to testify to an improperly arranged photo lineup identification, the witness may still testify to a description given to police officers before any taint occurred). That untainted description was off by only five years of age, two inches of height and a commensurate amount of weight. In most respects, it was a remarkably accurate portrait of the robber and consistent with Gonzalez's appearance. Apart from Miller's other, possibly tainted identifications, the evidence against Gonzalez was very strong. Gonzalez was present in the area within minutes of the robbery. He was a cocaine addict with an out-of-control addiction, and he had just lost his job and his only source of income, and so he had a strong need for money. He had previously discussed with Kelly that this particular bank would be "easy." He owned a sweatshirt identical to the one worn by the robber and had worn it within days of the robbery. That sweatshirt was recovered (with three $20 bills stuffed in the pockets) from a dumpster four blocks from the crime, next door to a McDonald's that Gonzalez visited within minutes of the robbery. The sweatshirt was recognizable to two employees of the Subway sandwich shop as the one worn by the robber. It was also

recognized by Pat, who had given the sweatshirt to Gonzalez, and by Katie and Kelly. The evidence included photos of Gonzalez holding or wearing the sweatshirt and photos of the sweatshirt recovered from the dumpster. Gonzalez denied that they were the same even though they were obviously identical. Gonzalez was also tied to the hat worn by the robber, with Kelly testifying that her boyfriend, Wilson, owned a similar hat, and Wilson testifying that he could not find the hat after Gonzalez visited Wilson's home.

Moreover, Pat and Katie Mewhirter came to the police station unbidden, after seeing the photo of the robber released by police, to report that the robber resembled Gonzalez and that they recognized his clothing and other aspects of his appearance. On viewing the bank video, Kelly also identified the robber as Gonzalez, and identified the sweatshirt and hat that he was wearing. These identifications were made by persons intimately familiar with Gonzalez, who recognized details of his stance and features of his body.

In response to all of this evidence, Gonzalez told a bizarre story about his whereabouts during the robbery. Having never missed a visit with his daughter, he missed his visit that day, even though he was in the same McDonald's where Jessica Wade was waiting in the parking lot with his daughter at precisely the same time. He claimed to have misunderstood the time of the visit, even though he sent a text indicating that his mistake was that the visit ran from 1:00 to 5:00 rather than 1:00 to 3:00 (indicating that he knew the start time even if he did not know the end time), and even though his visits had always been two hours long. He claimed to have been fishing nearby when Wade called. At 1:05, he thought it would take thirty-five

minutes to gather his fishing tackle and get to the restaurant, but two minutes later, at 1:07, he claimed to be in his car and on his way to McDonald's, which was only a few blocks away. He had no explanation for not texting Wade on arriving at the restaurant, even though he claims he did not see her and expected to find her there. He did not text about his arrival until after he admittedly left the McDonald's parking lot. Immediately after the text purportedly indicating his arrival (a text which inexplicably read "I'm in right now taking care of something. I would let you know. Thank you."), he texted that he would meet Wade at 3:15, even though he was at the McDonald's at 1:11 p.m., the same time that Wade was waiting for him in the parking lot. And he had arrived at the McDonald's, which was four blocks from the bank, within minutes of the teller triggering the silent alarm.

It is true that there was evidence favoring him as well. Kelly Mewhirter's credibility was tested by the deal she made with prosecutors on her own robbery charge, and by her complicated relationship with the father of her child. Pat Mewhirter had custody of Gonzalez's daughter and admittedly wanted to keep custody because she was aware that Gonzalez and her daughter were addicts. None of the $20 bills found in the sweatshirt matched the bait money, although this is not too telling given that the teller handed over additional non-bait $20 bills. There was no fingerprint or DNA evidence pointing to Gonzalez. But the evidence against Gonzalez easily overwhelmed these minor issues with witness credibility and the absence of certain physical evidence. The jury saw the video and then saw Gonzalez in person. Even if there had been a due process violation in admitting the evidence of Miller's in-court

or out-of-court identification, any error was harmless in light of the overwhelming evidence against Gonzalez.

**B.**

Gonzalez also objects to evidence that the government presented regarding Kelly's robbery of a restaurant four days before the bank robbery. He asserts that the government implied that he too was involved in the restaurant robbery and that this was improper propensity evidence under Federal Rule of Evidence 404(b). Gonzalez did not object to this evidence at trial and so we review the admission of the evidence for plain error only. *United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Hamad*, 809 F.3d 898, 904 (7th Cir. 2016). In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights. *Olano*, 507 U.S. at 732, 113 S. Ct. 1770; *Hamad*, 809 F.3d at 904.

Rule 404(b) provides that, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1); *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014). But this type of evidence may be used for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The restaurant robbery was highly relevant to Kelly's credibility because it resulted in a felony conviction. Moreover, she received a sentencing break for the restaurant robbery in exchange for cooperating in the bank robbery prosecution against Gonzalez, which was highly relevant to her credibility and bias. The government was careful not to implicate Gonza-

lez in the restaurant robbery, mentioning only that he was with Kelly after the incident. This too was relevant, non-propensity evidence because, as he drove Kelly to Evanston after the robbery, he was seen on video surveillance with her in a gas station along the way, wearing the Bears sweatshirt seen on the bank robber a mere four days later. Kelly did not state or imply in her testimony that Gonzalez participated in the restaurant robbery with her, and the government carefully worded its questions to avoid that implication. The government also avoided tying Kelly's restaurant robbery to Gonzalez during closing argument. To the extent that any of this testimony and argument came close to the line, there was no error in admitting the evidence as it was plainly relevant to Kelly's credibility and bias, and was not used to argue that Gonzalez had a propensity for robbery. Because there is no error in admitting the evidence of Kelly's conviction for a restaurant robbery, there is obviously no plain error.

AFFIRMED.