In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 24-1928

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KASHIF DUKES,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19 CR 48 — **Jorge L. Alonso**, *Judge.*

---

ARGUED APRIL 1, 2025 — DECIDED AUGUST 5, 2025

---

Before SYKES, *Chief Judge*, and SCUDDER and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. A jury found Kashif Dukes guilty of carjacking, 18 U.S.C. § 2119(1), brandishing a firearm during a carjacking, 18 U.S.C. § 924(c)(1)(A)(ii), and possession of a firearm by a felon, 18 U.S.C. § 922(g)(1). Dukes now appeals, arguing that the district court erred by admitting prejudicial evidence that he participated in an uncharged shooting on the same day as the carjacking. He also brings a sufficiency of the

evidence challenge, arguing that an impermissibly suggestive photo lineup cast significant doubt on a victim's identification of him as one of the carjackers and that the remaining circumstantial evidence was inadequate to support his conviction. We disagree and affirm.

I

A

On July 21, 2018, at around 4:30 pm, Sara Rodriguez and her daughter Angelica were leaving a friend's house after dropping off food for a barbeque. Sara's other daughter, Isabel, and Sara's infant granddaughter were waiting inside Sara's silver Chevrolet Equinox, which was parked on the street out front. Just as Sara and Angelica returned to the Equinox, a car swiftly pulled up parallel, boxing them in, as there was a car parked directly in front the Equinox. Two men jumped out of the car and pointed black handguns at Sara and Isabel, yelling, "Get the fuck out of the car." When Sara frantically explained there was a baby in the car, she was told to "[g]et the baby and get the fuck out." Isabel hurriedly unstrapped the infant from her car seat, and the three women hastened away from the vehicle. The two men sped off in Sara's Equinox while a third accomplice drove away in the car in which they had arrived. Frightened but unharmed, the women immediately called the police to report a carjacking.

About five hours later, at around 9:30 pm, approximately 45 shots were fired from four guns at a park only a few miles away from the site of the carjacking. Two witnesses saw a Black man flee the scene in a car resembling the stolen Equinox. At around 3:00 am the next morning, patrolling officers spotted Sara's Equinox. When they tried to stop the car,

however, the driver sped away. The brief high-speed chase that ensued ended abruptly when the driver of the Equinox lost control and crashed into a utility pole. Two Black men escaped the crashed Equinox on foot, and officers were unable to apprehend them.

A search of the Equinox revealed Angelica's cell phone along with the following items: a loaded black Ruger 9mm pistol with its serial number destroyed, a red flip phone on the floor under the driver's seat, an iPhone, a glass juice bottle, and, attached to a gray hooded sweatshirt, a purple ribbon imprinted with the words "Darriel" and "November 29th, 1990, to July 13th, 2018." A ballistics analysis later linked the Ruger pistol found in the car to cartridges recovered from the park shooting.

Shortly after the carjacking, all three Rodriguez women viewed a photo lineup of possible suspects. Though none of the women definitively identified any suspects in this initial lineup, Angelica wrote, "looks familiar, face features, fits the description given to CPD" on a photo of Kashif Dukes. About seventh months later, Angelica viewed a second, smaller photo lineup. This time, she positively identified Dukes, stating she was "95 percent" sure he was the man who had pointed a gun at her mother. A grand jury ultimately indicted Dukes for carjacking, in violation of 18 U.S.C. § 2119(1), brandishing a firearm during a carjacking, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). The grand jury also indicted Dukes on a second count of carjacking, which he pleaded guilty to before trial and is not at issue on appeal.

B

At trial, the government presented evidence that the red phone inside the crashed Equinox belonged to Dukes, and a forensic expert testified that Dukes's DNA was present on the glass bottle recovered from the car. Law enforcement testified that the purple ribbon recovered from the car matched those worn by attendees of the funeral of Darriel Knight, who died on July 13, 2018. The funeral for Knight—who went by the nickname "D-Nice"—took place the same day as the carjacking and shooting, and shortly before the shooting, Dukes posted a tribute to "D-Nice" on Facebook: "Rest up D-Nice It's Yo Day We Did It Fa yu."

The government introduced other Facebook posts from Dukes that seemingly referenced the carjacking and car chase. The day after the carjacking, Dukes posted on Facebook: "Last Night Was The Last Time Um Playing GTA Chicago on Gd i got CJ me and Ysl Lilcarl fucked them country boys up i kno we had at least 4 stars." Half an hour later, Dukes posted again: "Lost my phone Left Pipes idc Long Ass i Got Away." A government expert explained to the jury that "GTA" refers to Grand Theft Auto, a video game in which players carjack vehicles and commit other crimes to earn "stars" and that "pipe" is a shorthand for gun. The government also showed the jury a Facebook message Dukes sent to the mother of his child two days after the carjacking that read, in part, "i was in a fucking accident and almost got locked up for 2 pipes I lost my phone." Two days later, Dukes sent a message to another individual stating, "I lost my phone I was in a high speed."

Each of the three Rodriguez women testified about the carjacking, and Angelica also discussed her identification of Dukes from the photo lineups. Though their accounts differed

in their level of detail, all three women recalled that the carjackers were Black men carrying black guns. Isabel described the carjacker who pointed a gun at her mother as more than six feet tall and in his mid-twenties. The most specific description came from Angelica, who testified that she had a "clear view" of the man who pointed the gun at her mother. She described him as six feet tall with a thin but athletic build and short hair. A driver's license introduced by the government showed that Dukes was a 24-year-old Black man, six feet tall, and weighed 160 pounds. And a Facebook photo of Dukes on the day of the carjacking confirmed that, at the time, he had short hair and a slim but muscular build.

The jury also heard testimony from two witnesses to the park shooting. One witness testified that shortly after the shots stopped, he saw a Black male in his mid-twenties to mid-thirties, about six feet tall with a slim build and short hair, run into the backseat of a gray Equinox. Another witness said she saw three or four young Black men running from the park into a silver midsized SUV immediately after the shooting.

After the government rested its case, Dukes moved for a judgment of acquittal, but the district court deferred its ruling on the motion. The defense's case focused largely on the reliability of Angelica's identification of Dukes. An eyewitness identification expert for the defense told the jury that including a suspect's photo alongside different photos in multiple lineups is a flawed procedure that risks contaminating a witness's memory and causing false identifications during the second lineup. The expert stressed that a witness's first identification is the most reliable, and the defense showed the jury video footage of Angelica during the first lineup to illustrate

that her initial identification of Dukes was a low-confidence one. The defense also pointed out inconsistencies in Angelica's descriptions of the carjacker who brandished a gun at her mother—for example, she initially told police he had a full beard but at trial described him as having only stubble. And to undermine Angelica's assertion that she had a clear view of Dukes during the carjacking, the defense noted that she could not recall seeing Dukes's facial tattoos.

The jury ultimately found Dukes guilty on all counts. Dukes renewed his motion for a judgment of acquittal, which the district court denied. This appeal followed.

## II

On appeal, Dukes argues that the district court erred in admitting evidence of the shooting in the park. Because he was not charged in connection with the shooting, Dukes says this was improper and highly prejudicial propensity evidence. Dukes also challenges the sufficiency of the evidence supporting his conviction, arguing that Angelica's identification was unreliable and that, aside from her identification, the evidence linking him to the carjacking was minimal and purely circumstantial. We address each issue in turn.

## A

We review a district court's ruling on the admissibility of evidence for abuse of discretion. *United States v. Medrano*, 83 F.4th 1073, 1076 (7th Cir. 2023). Dukes contends that the evidence relating to the park shooting was inadmissible propensity evidence introduced to suggest to the jury that he was a violent and dangerous individual. See Fed. R. Evid. 404(b). Alternatively, he argues that even if this evidence was admissible under Federal Rule of Evidence 404(b), it should have

been excluded under Rule 403 because it carried a risk of unfair prejudice that outweighed its probative value. We disagree on both counts.

Under Rule 404(b), courts must exclude evidence of "other crimes, wrongs, or acts" submitted to prove a person's "propensity to behave in a certain way." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014) (en banc). Yet such evidence may be admitted for relevant non-propensity purposes, including (but not limited to) "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "Other-act evidence need not be excluded whenever a propensity inference can be drawn," however, and is admissible so long as its relevance to a permissible purpose can be established "through a chain of reasoning that does not rely on the forbidden [propensity] inference." *Gomez*, 763 F.3d at 860. Once a party makes this initial showing, the district court must still assess "whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great." *Id.*

1

For the most part, the parties and district court analyzed the shooting evidence under Rule 404(b). But evidence relating to the shooting was also admissible as direct evidence. Direct evidence of a charged offense "is almost always admissible against a defendant" and does not implicate Rule 404(b)—even when it is also possible to draw a forbidden propensity inference from the evidence. See *United States v. Gorman*, 613 F.3d 711, 717–19 (7th Cir. 2010) (no Rule 404(b) analysis necessary because evidence of prior car theft proved defendant gave false testimony and was therefore direct evidence of his

perjury charge); see also *United States v. Thomas*, 986 F.3d 723, 729–30 (7th Cir. 2021) (evidence that defendant set fire to mobile homes during relevant period was direct evidence of charged insurance fraud scheme, not other act evidence). In this context, direct evidence refers to evidence of conduct that is "part and parcel of the charged offense." 1 Edward J. Imwinkelried et al., Courtroom Criminal Evidence, § 904 (2025). Put another way, when "the wording of the allegations about the charge in the pleading is expansive enough to encompass the conduct" in question, it is not other act evidence at all. *Id.;* see also *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) ("When evidence is embraced by the conspiracy in the indictment, the court need not resort to Rule 404(b) analysis."); *United States v. Vargas*, 689 F.3d 867, 874 (7th Cir. 2012) (explaining that testimony about a defendant's cocaine trafficking prior to the period charged in the indictment is not "properly categorized as direct evidence" because it does "not tend to prove the elements of the offense for which [he] was actually charged").

The distinction between direct and Rule 404(b) evidence in this context can be subtle. Indeed, though we have regularly found similar firearm possession evidence admissible, our cases do not clearly establish whether such evidence is properly treated as direct evidence or permissible non-propensity evidence under Rule 404(b)(2). See *United States v. Canady*, 578 F.3d 665, 671 (7th Cir. 2009) (evidence that defendant "was seen with" "and may have used" a gun in an uncharged home invasion earlier in the day is admissible under 404(b) to help establish that he unlawfully possessed a firearm); *United States v. Miller*, 673 F.3d 688, 695 (7th Cir. 2012) (analyzing prior possession of firearm under 404(b) while stating that evidence of defendant's "recent possession

of the same gun was directly relevant evidence of the charged crime, not propensity evidence"); *United States v. Lowe*, 2 F.4th 652, 657 n.1 (7th Cir. 2021) (assuming but not deciding that Rule 404(b) governs testimony that officers were responding to call of "shots fired" because "*Canady* [] involved seemingly direct evidence but [] analyzed its admissibility under Rule 404(b)").

To ascertain whether evidence is direct or Rule 404(b) other act evidence, courts should look to the language of the indictment itself and ask whether the conduct in question falls within the scope of a charged offense. In the case of unlawful firearm possession, for example, evidence that a defendant possessed a different gun than the one charged or possessed a gun outside the relevant period of the indictment would fall outside the scope of the charged offense and would not qualify as direct evidence. Of course, such evidence may still be probative and admissible, but because "[e]vidence of prior, uncharged gun possessions by felons has the potential to be used for impermissible propensity purposes," courts must engage in a Rule 404(b) analysis to assure themselves of its admissibility. *Miller*, 673 F.3d at 695.

In this case, the evidence relating to the shooting falls squarely within the scope of a charged offense. The indictment charged Dukes with unlawfully possessing a Sturm Ruger 9mm pistol "[o]n or about July 21, 2018," and felony firearm possession is a continuing offense that ceases only when possession ends. *United States v. Ellis*, 622 F.3d 784, 793 (7th Cir. 2010). A ballistics report confirmed that the Ruger pistol referenced in the indictment was fired at the park shooting, which occurred on July 21, 2018—the same day as the charged unlawful possession. Eyewitnesses saw a shooter

matching Dukes's description fleeing the scene in the car in which the charged Ruger was later found (alongside Dukes's cell phone and DNA). Because the evidence of Dukes's involvement in the park shooting tended to show that he possessed the charged weapon during the relevant period in the indictment, it was admissible as direct evidence of the possession offense.

2

Evidence relating to the shooting was admissible as direct evidence of felony firearm possession, but the same evidence was also offered and properly admitted to establish Dukes's involvement in the carjacking. Shortly after the Equinox was taken, eyewitnesses saw a man matching Dukes's description get into a silver Equinox at the park. Had the government sought testimony only on Dukes's presence in the vehicle without any mention of the shooting, this evidence would have come in simply to prove that Dukes took the vehicle referenced in the indictment. This testimony (bolstered by the physical evidence tying Dukes to the Equinox) helped place Dukes in the stolen vehicle mere hours after the carjacking occurred, permitting the reasonable inference that he was likely one of the individuals who stole it. But, understandably, the government wanted the eyewitnesses to discuss the broader context of what they observed: that the man they saw used the Equinox to flee from the site of a shooting. Because participating in a shooting is not conduct encompassed within the scope of the charged carjacking, the testimony was other act evidence that the district court properly analyzed under Rule 404(b) as it related to the carjacking. And, as the court explained, evidence that Dukes used the Equinox in a shooting was readily admissible under Rule 404(b)(2) to show a

potential motive for the carjacking. See *United States v. Jackson*, 918 F.3d 467, 482–83 (6th Cir. 2019) (evidence of defendants' gang activity admissible under 404(b) to show motive for carjacking). A jury could reasonably infer that Dukes stole the Equinox to use it as a getaway car for a shooting that occurred the same day without relying on a forbidden character inference. This is exactly the sort of "propensity-free chain of reasoning" that Rule 404(b) permits. *Gomez*, 763 F.3d at 856.

3

Nor did the admission of the shooting evidence run afoul of Rule 403, which permits exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. Because nearly all relevant evidence is prejudicial, "we have emphasized that evidence must be *unfairly* prejudicial to require exclusion." *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (quotations omitted). And though we review Rule 403 decisions—like other questions of evidence admissibility—for abuse of discretion, we owe "special deference" to a district court's findings under Rule 403. *Id.* (quotation omitted).

As explained above, the evidence relating to the shooting was probative of key issues in the case: Dukes's possession of a firearm and his participation in the carjacking. The most prejudicial details relating to the shooting—including Dukes's gang ties and the fact that the shooting resulted in two deaths—were kept from the jury. And the district court further tempered any threat of unfair prejudice by issuing limiting instructions immediately before the shooting testimony was presented to the jury and again prior to deliberation. These instructions clarified that Dukes was not charged with the shooting and explained the limited purposes for

which the jury could consider this evidence. Absent any indication otherwise, "we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *United States v. Moore*, 641 F.3d 812, 824 (7th Cir. 2011) (quotation omitted).

B

Dukes also appeals the district court's denial of his motion for a judgment of acquittal, arguing that the evidence at trial could not support his convictions. We have often observed that defendants seeking a judgment of acquittal face "a nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (quotations omitted). In this posture, we view the evidence in the light most favorable to the government and will affirm if "any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *Id.* On appeal, Dukes focuses largely on the reliability of Angelica's identification of him as one of the carjackers. He says that this identification was tainted by an impermissibly suggestive procedure. Without Angelica's identification, Dukes argues, the government's case was weak and comprised almost entirely of circumstantial evidence.

It's not entirely clear whether Dukes means to challenge the admissibility of Angelica's eyewitness testimony or merely its reliability as a basis for his conviction. Though he cites case law on the admissibility of eyewitness identifications, Dukes never objected to or sought to exclude this evidence below and has accordingly waived any argument as to admissibility. See *United States v. Olano*, 507 U.S. 725, 733 (1993). In any event, there is a general presumption in favor of admitting eyewitness identifications. When evaluating the admissibility of an eyewitness identification, courts consider

(1) whether the identification procedure was "impermissibly suggestive" and, if it was, (2) whether the suggestive procedure "gave rise to a substantial likelihood of irreparable misidentification." *United States v. Gonzalez*, 863 F.3d 576, 584 (7th Cir. 2017) (quotation omitted). Regardless of whether the procedure here was unduly suggestive, this was not a case of irreparable misidentification, where the source of the alleged misidentification is "so elusive that it cannot be demonstrated to a jury." *United States v. Williams*, 522 F.3d 809, 811 (7th Cir. 2008). "Perceptual biases and errors are endemic to identification," but these issues ordinarily go to weight, not admissibility. *Id.* If the procedures used to identify Dukes were imperfect, the solution was to "expose the problem at trial so that a discount may be applied to the testimony." *Gonzalez*, 863 F.3d at 587 (quotation omitted).

At trial, Dukes had every opportunity to argue to the jury that Angelica's identification was unreliable and should be given little weight—and that's just what he did.[*] A defense expert testified that including the same suspect in multiple photo lineups alongside different filler photos increases the risk of misidentifications. An identification like the one Angelica made, he explained, is a "textbook case study example of memory contamination" in which an individual makes a low-confidence identification in an initial lineup and later makes a high-confidence identification of the same person in a subsequent lineup.

---

[*] On appeal, Dukes raises several additional theories as to why the identification was unreliable, pointing to research on race bias and weapons focus. But this research was not presented to the jury and is therefore not relevant to our sufficiency of the evidence assessment. *United States v. Maez*, 960 F.3d 949, 968 n.9 (7th Cir. 2020).

But just as the jury was free to believe the defense expert, they were also free to credit Angelica's testimony that she had a clear view of the carjacker who pointed a gun at her mother. Indeed, even if the jury agreed that the second photo lineup was suggestive, they could have reasonably concluded that Angelica's identification of Dukes was nevertheless corroborated by the circumstantial evidence implicating Dukes: Dukes matched the description the Rodriguez women gave of one of the carjackers, as well as witness descriptions of one of the suspects seen fleeing from the shooting and, later, from the scene of the crash. Dukes's cell phone and DNA were found inside the stolen Equinox, along with a Ruger pistol that generally matched the description of one of the black guns used in the carjacking. Ballistics evidence and eyewitness testimony suggested Dukes used the car as a getaway vehicle in a shooting only a few hours after the carjacking. And Dukes himself wrote multiple incriminating Facebook messages and posts that referenced playing "GTA Chicago" and losing his gun and phone in a police chase.

Dukes acknowledges that, taken together, this circumstantial evidence strongly suggests he was in the Equinox at some point during the 12 hours between the initial carjacking and the crash. But it is pure conjecture, he argues, to further infer that he participated in the carjacking. It's true that while the evidence tying Dukes to the crashed Equinox and the shooting was strong, the evidence of his participation in the carjacking was less overwhelming. But the government need not establish that there was overwhelming evidence to defeat a sufficiency of the evidence challenge. *United States v. Smith*, 223 F.3d 554, 577 (7th Cir. 2000). Nor is it relevant that much of the evidence of Dukes's guilt was circumstantial. "[C]ircumstantial evidence is no less probative of guilt than direct

evidence" and is "even more reliable" in some cases. *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002) (quotation omitted).

"A jury is entitled to employ common sense in making reasonable inferences from circumstantial evidence." *United States v. Colon*, 919 F.3d 510, 516 (7th Cir. 2019) (quotation omitted). Here, it was not unreasonable for the jury to infer that Dukes participated in the carjacking based on the circumstantial evidence detailed above, which was bolstered by Angelica's identification. Of course, Dukes was free to argue that his presence in the car was purely coincidental, but "the government's proof need not exclude every reasonable hypothesis of innocence" and "the trier of fact is free to choose among various reasonable constructions of the evidence." *Starks*, 309 F.3d at 1022 (quotation omitted). In the end, the government presented ample evidence to prove Dukes's guilt, and we see no basis for disturbing the jury's verdict.

AFFIRMED